# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2318

JEFF T. PAGEL,

*Plaintiff-Appellant,*

*v.*

TIN INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-CV-1132—**Joe Billy McDade**, *Judge.*

ARGUED MAY 24, 2012—DECIDED AUGUST 9, 2012

Before CUDAHY, KANNE, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Jeff Pagel brought this action alleging that his employer, TIN Inc., violated the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, by interfering with his right to take leave and retaliating against him for exercising that right. The district court granted summary judgment in favor of TIN, reasoning that the company fired Pagel for poor performance rather than for taking leave. Because we believe genuine

issues of material fact remain unresolved, we reverse and remand for further proceedings.

## I. BACKGROUND

We review grants of summary judgment *de novo*, viewing the record in the light most favorable to Pagel and drawing all reasonable inferences in his favor. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). The following description of the facts reflects this perspective.

TIN manufactures and supplies containerboard to customers seeking both corrugated packaging products and custom displays. In May 2000, TIN hired Jeff Pagel as an account manager—TIN's term for an outside sales-man. Pagel's sales territory extended from Central Illinois to Western Indiana, and his primary responsi-bilities included: calling on existing and prospective customers, creating custom-packaging designs, coordi-nating orders with production facilities, and planning and reporting sales activities to company management. Generally, account managers have significant flexibility in scheduling sales calls and resolving customer prob-lems. In his six years at TIN, Pagel earned a steady annual salary of about $180,000, comprising both base pay and commission. The commission portion of Pagel's income was based on annual sales of at least $7 million.

On January 1, 2006, Pagel began reporting to Scott Kremer, Regional Sales Manager. Also beginning in 2006, company management required supervisors to give each account manager a periodic performance evalua-

tion—something Pagel never previously received. As part of the evaluation procedure, Kremer asked his account managers to submit daily activity reports summarizing each day's sales and two-week itinerary reports identifying future sales activities and leads. Account managers were also required to submit a periodic list of sales prospects and targets. Compliance with these reporting requirements was noted on each account manager's evaluation.

That summer, Pagel experienced chest pain and labored breathing, prompting him to visit two physicians in July 2006. During his second appointment on July 21, Dr. Nicholas Shammas ordered a two-day stress test for August 4 and 7. The tests revealed a septal wall ischemia—a blockage in a portion of his heart. On August 29, Pagel was admitted to the hospital for an angioplasty and stent placement. He was discharged the next day and advised to rest for several days thereafter. The following week, Pagel's symptoms returned, and he was quickly admitted to Genesis Medical Center for two nights. Although an examination did not expose any additional heart trouble, a CT scan revealed an irregular and unrelated mass in his left lung. A subsequent September 18, 2006, PET scan of the mass was negative. Pagel claims each of these absences was covered by the FMLA, and he further claims that he gave Kremer prior notification of each absence.

On August 24, 2006, five days before his angioplasty, Kremer and Crawfordsville, Indiana, Plant Manager Rick Eaks, called Pagel to a meeting to discuss his year-to-

date performance. Kremer observed that Pagel's sales revenue and volume had declined over the past two years and the 2006 year-to-date numbers were the worst yet. Kremer also chided Pagel for submitting the fewest number of new custom-packaging designs of any account manager and making the second fewest daily sales calls. The memo ended by indicating that Pagel risked termination if his performance did not improve. Pagel vigorously disputed, and continues to dispute, Kremer's underlying data, arguing that there were numerous sales of which Kremer was unaware. Pagel also contends that Kremer's per-day calculations inaccurately included days that he received FMLA-qualifying treatment. Prior to the August 24 meeting, Pagel had never been disciplined or warned about his performance.

While Pagel was still in a Davenport, Iowa, clinic for the September 18 PET scan, Kremer called to notify him that Kremer would be in Champaign, Illinois, the following day. Kremer wanted to observe and evaluate Pagel's performance during what is known as a sales ride along—a standard practice at TIN. Because Pagel had no prior plans to be in Champaign on September 19, he hastily attempted to schedule a few calls. According to Pagel, scheduling a sales call typically requires as much as one week's notice to the prospective customer, not to mention the time it takes account managers to prepare for each call. In any event, Pagel and Kremer only attended one scheduled call and one unscheduled call that day. A third call was attempted, but, unbeknownst to Pagel, the prospective customer had moved locations.

Both Pagel and Kremer agree that the ride along did not go as planned—Kremer called it disastrous and Pagel concluded that it could have gone better.

For Kremer, Pagel's poor performance during the ride along was the final straw. In a memorandum dated October 2, 2006, and delivered October 4, Kremer terminated Pagel's employment, ostensibly for poor performance. The memo relayed the details of the ride along, and it further noted that Pagel's performance had not improved since the August 24 evaluation. As he did with the performance evaluation, Pagel vehemently disputed the accuracy of the data and metrics Kremer outlined in the termination memo. In at least one instance, Pagel correctly noted that Kremer incorrectly criticized him for missing reporting deadlines on days Pagel received medical treatment.

In October 2008, Pagel filed suit in Illinois state court alleging FMLA claims for interference and retaliation. TIN removed the complaint to federal court and filed a motion for summary judgment shortly thereafter. The district court granted summary judgment for TIN, reasoning that Pagel's poor performance on the September 19 ride along was a sufficient, non-discriminatory reason for termination. Pagel filed this timely appeal.

## II. ANALYSIS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists if a reasonable jury could find for either party. *Stokes v. Bd. of Educ. of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010).

The FMLA generally provides eligible employees suffering from a serious medical condition with as many as twelve weeks of unpaid leave during any twelve-month period. 29 U.S.C. § 2612(a)(1)(D). Employers are prohibited from both interfering with, *id.* § 2615(a)(1), and retaliating against, *id.* § 2615(a)(2), an employee's use or attempted use of FMLA leave. The difference between the two theories is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim only requires the employee to prove that the employer denied him entitlements provided by the Act. *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). On appeal, Pagel argues that the district court erred in granting summary judgment to TIN on both counts. We consider each claim individually.

### A.  FMLA Interference

It is unlawful for employers to interfere with an employee's attempt to exercise her rights under the FMLA. 29 U.S.C. § 2615(a)(1). Here, Pagel claims that TIN denied him his duly earned FMLA rights because the company improperly considered missing reports in its decision to fire him, and it did not adjust Pagel's sales expectations despite the many days he spent receiving treatment. To prevail on an FMLA-interference theory, the

plaintiff employee must prove that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011) (*quoting Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010)). TIN concedes that Pagel's claim satisfies the first two elements, and thus our analysis focuses solely on the last three.

Before considering the three contested elements, we must first address TIN's claim that Pagel waived his interference claim on appeal. TIN recognizes Pagel's recitation of the elements of an interference claim in his opening brief, but the company argues that Pagel was really addressing the discriminatory-intent element of a retaliation claim. As such, Pagel must have waived any further pursuit of his interference claim. *See Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 650 (7th Cir. 2011) (insufficiently developed arguments are waived on appeal). We disagree. Pagel's discussion of discriminatory intent and pretext appears to be in response to the district court's holding that Pagel's poor performance during the ride along constituted a legitimate, non-discriminatory reason for termination. Pagel undoubtedly focused so heavily on this inter-ference element because it was the only element the district court found lacking in his claim. Moreover, TIN ignores the role pretext evidence can play in rebutting an employer's claim that an employee was

fired for a non-discriminatory reason. *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 715 (7th Cir. 2009) ("Although proof of pretext is not necessarily sufficient, by itself, to support an FMLA interference claim, it can have some evidentiary value."). All of this is to say that Pagel did not waive his interference claim, and thus, we move to the three disputed elements.

*1. Entitlement to FMLA Leave*

An employee is entitled to FMLA leave if she suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008). The Act defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

For the first time on appeal, TIN argues that Pagel's September 18, 2006, PET Scan does not qualify as a serious health condition, because it neither required inpatient care nor continuing treatment. In other words, the PET scan had nothing to do with Pagel's serious heart condition. But, TIN did not present this claim to the district court and therefore, we need not consider it. *Fednav Int'l Ltd. v. Cont'l Ins. Co.,* 624 F.3d 834, 841 (7th Cir. 2010) ("It is well-settled that a party may

not raise an issue for the first time on appeal."). Even if TIN preserved this argument, we still find that Pagel's serious health condition—septal wall ischemia—required an inpatient stay the night of August 29 and again on the nights of September 6 and 7. That inpatient care qualifies his heart ailment as a serious health condition, even if we were to ignore any alleged interference during Pagel's September 18 absence. *See* 29 U.S.C. § 2611(11); 29 C.F.R. §§ 825.113(a), 825.114.

For purposes of completeness, we also address whether Pagel's heart condition prevented him from performing the essential functions of an account manager.[1] 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.123(a) ("An employee is 'unable to perform the functions of the position' [if] . . . the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position . . . ."). Although Pagel apparently made a few phone calls to customers during his recovery, the district court correctly reasoned that Pagel could not fully perform the essential function of visiting existing and prospective customers. After all, TIN would not have provided Pagel a company car if calling on customers required nothing more than a phone call.

---

[1] Before the district court, TIN argued that Pagel's serious health condition did not prevent him from performing the essential functions of his job. TIN evidently abandons this claim on appeal.

*2. Notice of FMLA Leave*

To succeed on an interference claim, Pagel must also show that he provided sufficient notice of his intent to take leave. *See Makowski*, 662 F.3d at 825. The employee's primary duty in notifying his employer is to provide enough information to the employer "to show that he *likely* has an FMLA-qualifying condition." *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006). Although the employee need not "expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice," 29 C.F.R. § 825.301(b), an employee's reference to being "sick" is generally not enough, *de la Rama*, 541 F.3d at 687. The district court below found that Pagel produced enough notice evidence to at least create a genuine issue of material fact. It correctly noted that the notice inquiry is a "fact-rich question . . . perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness." *Pagel v. TIN Inc.*, 832 F. Supp. 2d 965, 972 (C.D. Ill. 2011) (*quoting Burnett*, 472 F.3d at 479 n.4).

On appeal, TIN begins by arguing that Pagel's notice was insufficient. There is certainly some force to this argument given that the record could charitably be described as incomplete. Nonetheless, the record contains enough evidence for a reasonable jury to conclude that Pagel met his burden on the notice element. For example, Pagel claims that he spoke with Kremer about his chest pain prior to both his July 10 and July 21 ap-

pointments, but his memory is fuzzy about the contents of their conversations. (Pagel Dep. at 83-84.) Pagel's memory is similarly fuzzy about the notice he gave Kremer prior to the two-day stress test in early August, but he believes they discussed the tests. (*Id.* at 84.) Pagel more definitively states that he both phoned and emailed Kremer about his need for leave prior to the angioplasty and stenting procedure, but he was unable to produce a copy of the email. (*Id.* at 87-88.) We agree with TIN that Pagel's description of the provided notice is ambiguous, but for his part, Kremer admits that he was aware of Pagel's chest pain, and that he was told that Pagel "was going to be in the hospital." (Kremer Dep. at 18.) Although Pagel's notice evidence may not be enough to win at trial, at summary judgment, Kremer's admission and the parties' conflicting evidence at least creates a genuine issue of material fact that is best resolved by the trier of fact. *Burnett*, 472 F.3d at 479 n.4.

TIN's second attack on Pagel's notice evidence rests on our decision in *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 952 (7th Cir. 2004). TIN claims that *Aubuchon* requires that FMLA notice include a demand for leave, which is something that Pagel's request allegedly omitted. This argument is meritless because Kremer conceded in his deposition that Pagel requested days off. (Kremer Dep. at 84.) Moreover, Kremer knew of Pagel's need for hospitalization, (*id.* at 18), and accordingly, it is difficult for us to imagine a scenario where Pagel's notice of hospitalization did not include an implicit demand for leave. Ultimately, we agree

with the district court's conclusion that Pagel has produced enough notice evidence to survive summary judgment.

### 3. Employer Interfered with FMLA Rights

Finally, Pagel must prove that TIN denied him FMLA benefits to which he was entitled. *Makowski*, 662 F.3d at 825. As a general matter, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." 29 C.F.R. § 825.220(c). To succeed, Pagel must establish, by a preponderance of evidence, that he was entitled to the benefits he claims. *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001). But, the employer "may present evidence to show that the employee would not have been entitled to his position even if he had not taken leave." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 636 (7th Cir. 2009). In other words, "employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002). To survive summary judgment, Pagel must overcome any such evidence offered by TIN. *Cracco*, 559 F.3d at 636.

Pagel argues that TIN interfered with his employment by failing to make a reasonable adjustment to its employment expectations to account for his FMLA-protected leave, and then terminating him when he failed to meet

those unadjusted expectations. The FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave. In *Lewis v. School District #70*, 523 F.3d 730, 743 (7th Cir. 2008), for example, we reversed the district court's grant of summary judgment for the employer on an FMLA claim. There, the employee offered evidence that her employer had expected her to complete all the duties of a full-time bookkeeper while she was taking intermittent FMLA leave, and then fired her for failing to meet that full-time standard. *Id.* at 736-37. We concluded that the performance problems that supposedly justified the termination were a direct result of her FMLA leave so that termination for those reasons would have made her FMLA leave "illusory." *Id.* at 743; *see also Wojan v. Alcon Labs., Inc.*, No. 07-11544, 2008 WL 4279365, at *5-6 (E.D. Mich. Sept. 15, 2008) (denying summary judgment on FMLA interference claim; jury could conclude employer used former sales representative's FMLA leave against her by failing to adjust her sales quotas and performance scores to account for her protected leave and then terminating her for failing to meet that unadjusted standard) (*citing Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447-48 (6th Cir. 2007) (reversing summary judgment for employer on plaintiff's FMLA interference claim; employee was ostensibly terminated for failing to take a "functional capacity exam" and to return to work after being placed on severe work restrictions by company

doctor, but company doctor had imposed restrictions based on knowledge that employee previously had taken significant FMLA-protected leave)).

At summary judgment, Pagel presented evidence showing that TIN terminated him in part for not meeting sales expectations, even though he had missed a number of days for FMLA treatment. (Kremer Dep. at 37, 45.) He also presented evidence showing that Kremer relied on inaccurate data in finding that Pagel did not meet some of the company's reporting requirements. TIN subsequently admitted to some of these inaccuracies. (Appellee's Br. at 26.) Based on this evidence, Pagel has presented enough evidence to meet his initial burden. *See Kohls*, 259 F.3d at 804. TIN countered Pagel's evidence with its own evidence showing that Pagel was terminated for poor performance. The district court accepted TIN's argument, reasoning that Pagel's disastrous performance during Kremer's ride along was a legitimate, non-discriminatory ground for his termination.

On appeal, Pagel initially claims that his performance on the ride along was not as bad as Kremer describes. But, like the district court, we find no merit to this argument because "this court does not sit as a super-personnel department that reexamines an entity's business decisions." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 324 (7th Cir. 2003). We have little expertise in evaluating the merits of business and personnel decisions, and we see no need to make an exception here.

Pagel also claims that his performance during the ride along should not be considered because Kremer set him up to fail. Pagel continuously refers to his undisputed deposition testimony suggesting that account managers need one week to set up and prepare for a sales call. (Pagel Dep. at 127.) Although Pagel concedes that Kremer observes each account manager under his supervision, he argues that the one day he was given to schedule sales calls guaranteed poor performance. The district court was unpersuaded by this second argument primarily because it saw no evidence in the record to suggest that Pagel objected to Kremer's ride along at the time the request was made. We disagree. First, nothing requires Pagel to have objected to the requested ride along. In fact, employees routinely comply with a superior's request regardless of how unfair the employee perceives that request to be. Moreover, Pagel was already on thin ice with Kremer, meaning that Pagel's objection was even less likely. Second, any failure to object does not change the inference that Kremer's request for a ride along, at least at summary judgment, looks suspicious. The record suggests that account managers need time to set up a sales call—perhaps as much as one week. Because Pagel was only given one day to set up sales calls in a city he did not previously intend to visit, it is no wonder that everyone agreed that he could have done a better job. Certainly, a reasonable jury could interpret this evidence as Kremer setting up Pagel for failure.

Finally, TIN claims there were independent grounds to find that Pagel's performance had become unacceptable.

For example, TIN contends that Pagel's sales revenue and volume had declined, he had identified no new target customers, and he did not contact two prospective customers in his territory. According to TIN, this independent data should have permitted Kremer to fire Pagel even if he completely ignored Pagel's performance during the ride along. We are not convinced. First, the district court relied solely on Pagel's performance during the ride along in finding that TIN had a non-discriminatory reason for firing Pagel. *Pagel*, 832 F. Supp. 2d at 973-74. Second, and as the district court found, much of the evidence on which TIN relies is disputed, and we are of course required to draw all inferences in Pagel's favor at summary judgment, *Draper*, 664 F.3d at 1113. For example, Pagel contends that his commission-based salary should have declined if TIN's claims about the drop-off in his sales revenue and volume were really true. To the contrary, the record suggests Pagel's salary remained stable. Moreover, Kremer conceded that some of the reporting observations he made in the termination memo were inaccurate. Perhaps these independent grounds for termination will play a role at trial, but at summary judgment, we find that Pagel has offered sufficient evidence of interference to survive.

## B.  FMLA Retaliation

Employers are also prohibited from retaliating against an employee that exercises or attempts to exercise FMLA rights. 29 U.S.C. § 2615(a)(2). In other words, the

employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008). "We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). That is, an employee can proceed under the direct or indirect method of proof. *Burnett*, 472 F.3d at 481. Here, Pagel abandoned any mention of the indirect method on appeal, and thus, we only review his direct evidence of retaliation.

Under the direct method, Pagel must show: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action. *Cracco*, 559 F.3d at 633. To succeed, Pagel must of course be entitled to FMLA benefits, but we have already concluded that his serious health condition entitled him to FMLA leave, so we focus only on the causal link. The causal-nexus element may be met through either a direct admission from Kremer or through "a convincing mosaic of circumstantial evidence" permitting that same inference. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination. *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012).

On appeal, Pagel primarily argues that TIN's claim of poor performance is mere pretext, and for the reasons discussed earlier, we agree. The undisputed record evidence suggest that account managers need one week to schedule and fully prepare for a customer visit. Here, the one-day notice looks like nothing more than a set up. Although poor performance can certainly be a valid, non-discriminatory basis for Pagel's termination, a genuine issue of material fact remains as to whether this was the true reason for Pagel's termination. *See Burnett*, 472 F.3d at 482.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of TIN and REMAND for further proceedings consistent with this opinion.