In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 23-1541

MARIANNE WAYLAND,

*Plaintiff-Appellant,*

*v.*

OSF HEALTHCARE SYSTEM,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:20-cv-01337-JEH — **Jonathan E. Hawley**, *Magistrate Judge.*

———————

ARGUED DECEMBER 13, 2023 — DECIDED FEBRUARY 28, 2024

———————

Before WOOD, KIRSCH, and LEE, *Circuit Judges.*

WOOD, *Circuit Judge.* Marianne Wayland sued her former
employer, OSF Healthcare System, for violating her rights un-
der the Family and Medical Leave Act (FMLA, or the Act),
29 U.S.C. §§ 2601–2654. She argues that the Act required OSF
to adjust its performance expectations to reflect her reduced
hours while she was on leave. The district court entered sum-
mary judgment for OSF, reasoning that OSF justifiably fired
her for not meeting its expectations. But because there is a

genuine dispute of material fact over the amount of approved leave Wayland took, and because, accepting Wayland's numbers, a reasonable jury could find that OSF unlawfully failed to adjust its expectations by properly taking that leave into account when evaluating her, we vacate the judgment and remand for trial.

**I**

We construe all facts in the light most favorable to Wayland, the nonmoving party. *Pagel v. TIN Inc.*, 695 F.3d 622, 624 (7th Cir. 2012). Wayland started working for OSF, a multisite healthcare provider, in 1999. Most recently she managed OSF's Institute of Learning, which trains OSF workers to help integrate new operations into OSF. As manager, Wayland oversaw about 30 employees. From 2017 to 2018, OSF expanded significantly, leading to more work for the Institute (and Wayland) on shorter deadlines. For example, in the past Wayland's team had six to twelve months to integrate a single new hospital into the system, but in 2018 OSF cut that time down to four months to absorb two new hospitals. Although the Institute was struggling to handle this new workload, Brandy Fisher, who became Wayland's supervisor in 2016, gave Wayland positive performance reviews in both 2017 and 2018.

During this period of expansion, beginning in October 2018, OSF approved Wayland's request for both continuous and intermittent medical leave under the Act. Her continuous leave was authorized for one month, from November 7 to December 10, 2018. Her intermittent leave allowed her to take one to two days off per week beginning in October 2018.

The amount of leave Wayland took is disputed. On one side of the ledger is Wayland's testimony. At her deposition, she stated that she took about three weeks of continuous leave, and she took intermittent leave as needed "a few times a month." She quantified in a sworn declaration that cumulatively she missed "more than six weeks of work because of her … leave" between October 2018 and April 2019. This amounts to approximately one day off per week, over that 30-week period. On the other side of the ledger is the testimony from one of OSF's human-resources agents, Sharon Bond. She stated in an affidavit that Wayland took only about ten days of leave: nine days of continuous leave in November 2018 and one day of intermittent leave in April 2019.

During her period of approved leave and OSF's expansion, OSF told Wayland that she and her staff had "no choice" but to meet OSF's accelerated goals. This created challenges for Wayland. First, because of her time away on leave, she was unable to, and did not, meet all the goals and deadlines that applied when she worked full-time. She also struggled to manage her staff and keep up with the increased workload as effectively as she had done before her leave. In addition, OSF surveys its employees annually to learn how well departments are operating. In August 2018 it rated the Institute at "Tier 3"—the lowest possible rating. Wayland discussed these concerns with Fisher, but Fisher insisted that Wayland needed to complete all projects under the increased goals.

Another problem arose during this time when OSF received anonymous complaints from the Institute's staff through OSF's "integrity" phone line. Most calls focused on the "bullying" inflicted by one of Wayland's subordinates—a practice that some callers accused Wayland of tolerating.

Wayland met with Fisher and Bond to discuss these calls; they decided not to discipline the subordinate formally. Instead, they directed Wayland to meet with the identified person about her behavior. Fisher and Bond reassured Wayland that the calls did not suggest problems with Wayland's leadership; they indicated only that callers disliked recent changes to OSF and the Institute.

In May 2019, a month after Wayland stopped taking intermittent leave, Fisher and Bond put her under a "performance improvement plan." Despite the label, they said that they were not doing so because of any deficiency in Wayland's performance, nor did they indicate that the plan related to the issues raised on the integrity line calls or the survey. Instead, they told Wayland, the plan was simply designed to tighten the Institute's deadlines further, reflecting its expanded workload, and to help keep Wayland organized. Wayland promised to try to meet the new timelines. Fisher acknowledged, however, that she "didn't know" if doing so was even possible, and Bond offered (but never supplied) Wayland a mentor to help her. Bond and Fisher also told Wayland that they would "not be formal" with the plan and that Wayland was not required to sign it or document conversations about it. Notably, they did not warn Wayland that deficient performance under the plan would jeopardize her job. Over the next few weeks, Wayland met most of the deadlines under the plan. She fell short only with respect to deadlines that required outside entities to coordinate with her. Even so, OSF fired her in early July 2019, two months after she stopped taking leave and a month after the start of the plan.

In this suit, Wayland contends that, in violation of her rights under the Act, OSF fired her because she took approved

medical leave. OSF moved for summary judgment, arguing that it granted Wayland all the leave that she requested and that it fired her because of her performance. The district court, through a magistrate judge presiding with the parties' consent, see 28 U.S.C. § 636(c), granted OSF's motion. Wayland has now appealed.

## II

The district court's grant of summary judgment in OSF's favor reflects its conclusion that no rational trier of fact could find on this record that the company either interfered with Wayland's rights under the Act or retaliated against her for her use of FMLA leave. We conclude, to the contrary, that Wayland succeeded in raising genuine issues of material fact, and that if a trier of fact were to accept her evidence, she would prevail.

Most important is the existence of a genuine factual dispute over the amount of approved leave that Wayland took. A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case. E.g., *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021); see FED. R. CIV. P. 56(a).

We first explain why this dispute is genuine. As Wayland testified in detail in her deposition and declaration, she took continuous and intermittent leave totaling 6 weeks of work out of about 30 weeks between October 2018 and April 2019. Because Wayland has personal knowledge of her own specific leave time, and a jury could rationally believe that she accurately recalled it, her deposition testimony and affidavit are admissible evidence that a district judge cannot discredit at

summary judgment. *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006) (reversing summary judgment against prisoner where prisoner's affidavit was detailed, specific, and based on personal knowledge). Further, her deposition testimony and declaration are consistent; we thus have no reason to exclude the latter. See *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016). Wayland's account, however, conflicts with OSF's testimony that she took off only ten days of leave over that period. This leaves us with a genuine dispute of fact about the number of days she was absent on her authorized FMLA leave. See *FKFJ, Inc.*, 11 F.4th at 584.

This dispute is material to Wayland's claim. Wayland's testimony implies that she took leave for as much as 20% of the full-time work period between October and April (roughly a day a week for a period of 30 weeks, or 30 days out of a possible 150); OSF's testimony implies that she took off significantly less time—under 7% of that period. As we explain more fully below, a jury reasonably could find that when an employee is available for work only 80% of a full-time schedule, and the reason for the 20% shortfall is because she has taken protected leave, the employer must adjust its expectations to comply with the Act.

### III

Under the FMLA, employers are prohibited from both "interfering with" and "retaliating against" an employee's use of leave under the Act. 29 U.S.C. § 2615(a)(1), (2). OSF's conduct amounted to interference with Wayland's use of leave if it denied her "benefits to which she was entitled" under the Act. See *Pagel*, 695 F.3d at 627. (This is the last of five elements of an interference claim; the other four are uncontested here. They are: (1) she is eligible for protection, (2) the Act covers

OSF, (3) she was entitled to leave under the Act, and (4) she notified OSF of her intent to take leave. *Id.*) OSF retaliated against Wayland if it fired her because of her leave-taking. *Id.* at 631. For either claim, the Act does not require an employer to adjust its performance standards "for the time an employee is actually on the job." *Id.* at 629. But the Act "can require that performance standards be adjusted to avoid penalizing an employee for being absent during" approved leave. *Id.*

We conclude that a jury could find that OSF interfered with or retaliated against Wayland's use of leave by holding her to standards that were at least as demanding as when she worked full time, and then firing her for falling short. Wayland presented evidence that OSF did not adjust its standards to reflect the time that she was away on approved medical leave: According to her, she was on approved medical leave for roughly 20% of full-time work, yet OSF told her that she had "no choice" but to finish her projects under unrelaxed deadlines. And those unadjusted deadlines had recently become even *more* onerous than before she started her approved leave: OSF required that her unit absorb two hospitals in four months rather than one every six months, as was the case earlier. This evidence of unadjusted performance standards, despite her approved absence for 20% of full-time work, would allow a jury to conclude that OSF both interfered with her leave-taking rights and retaliated against her by firing her. Interference would exist if, despite nominally granting her request for FMLA leave, it deprived her of the benefits of that leave by insisting on 100% of the workload to be performed in only 80% of the time. Retaliation would exist if the jury concluded that she lost her job because of her use of FMLA leave.

We have vacated summary judgment under the Act when an employer has applied full-time standards to justify firing a leave-taking employee. *Id.* at 629 (reversing summary judgment where employer held employee to the same sales expectations while on protected leave as before leave); see also *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 743 (7th Cir. 2008) (reversing summary judgment because employer expected employee to complete the duties of a full-time bookkeeper while on protected leave, and then fired her for failing to do so). As in these cases, a jury here must decide whether to credit Wayland's evidence that OSF failed to adjust its expectations to reflect her 80% status, fired her as a result, and thereby interfered with her right to take leave, or if OSF retaliated against her for taking protected leave.

OSF does not rebut this analysis directly; instead it insists that a jury would be compelled to find that it relied on other events to fire her. First, it contends that it relied on the disappointing results of the Institute's annual survey and the complaints from the integrity line. Second, it contends that it relied on Wayland's failure to meet her performance improvement plan, which it implemented a month after she stopped taking leave. But Wayland rightly counters that the evidence is not so one-sided: A jury could find that OSF's asserted reliance on these matters is pretextual and that, consequently, OSF's true reason for firing Wayland was unlawful. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

In short, this case must be resolved by a jury. See *Coleman v. Donahoe*, 667 F.3d 835, 853–54 (7th Cir. 2012) (vacating entry of summary judgment because the employer "did not take the rule … as seriously as they claimed," which was evidence of pretext). The evidence, viewed as it must be in the light most

favorable to Wayland, suggests that the survey results and integrity calls did not matter to OSF. Despite the survey's results, OSF gave Wayland a satisfactory rating the same year as it received those results. It also assured her that the integrity line calls did not reflect poorly on her leadership. Finally, it cited neither the survey nor the calls in the performance plan that it later created for Wayland.

Regarding the performance plan, Wayland has likewise presented evidence that Fisher and Bond did not regard the plan, or Wayland's compliance with it, as bearing on her legitimate job performance. OSF did not tell her that poor performance was a reason for the plan or that deficient performance under it would lead to discharge. To the contrary, Fisher told Wayland that OSF would "not be formal" about the plan, and that Wayland did not have to sign it or document any conversations about it. Further, the plan set expedited goals that Fisher herself "didn't know" were possible to meet. OSF told her that she would need the help of a mentor to accomplish the goals of the plan, but then it never gave her one. Finally, the only goals that Wayland did not meet relied on coordination with external parties over whom Wayland had little control. Viewed as a whole, this evidence raises a genuine question whether OSF sincerely believed that the survey results, integrity line calls, or compliance with the performance plan justified firing her.

We VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, dissenting. The majority is correct that, under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., an employer who terminates an employee who takes FMLA leave for failing to meet performance standards that are not adjusted to account for her leave may be engaging in unlawful interference with leave or retaliation. But to prove either illegal interference or retaliation, Marianne Wayland must show a causal nexus between the exercise of her FMLA rights and her termination. *Pagel v. TIN Inc.*, 695 F.3d 622, 629–31 (7th Cir. 2012). The majority's conclusion that a reasonable jury could find that her performance problems, and thus her termination, were caused by her FMLA leave stems from the majority's erroneous distribution of Wayland's time on FMLA leave. Under a correct reading of the record, the performance problems that arose after the implementation of the performance improvement plan (PIP) in May 2019 and ultimately resulted in her termination were not due to her FMLA leave. Because she cannot establish the necessary causal link, I respectfully dissent.

The majority incorrectly distributes Wayland's leave across the entire period of October 2018 through April 2019, finding that Wayland was on approved FMLA leave for up to 20% of that period—effectively one day per week. *Ante,* at 6. In reality, Wayland took nearly all her leave before 2019. She repeatedly asserted that she took almost five weeks of continuous FMLA leave from November 7 through December 10, 2018. And Wayland stated in her declaration that she only took several days of intermittent FMLA leave, testified that she took such leave only a few times a month after her continuous leave, and affirmed at oral argument that she took only nine days of intermittent leave. She also maintains that she missed more than six weeks of work while on FMLA leave,

which is consistent with her taking around five weeks of leave in November and December 2018 and only nine days from December 2018 through April 2019. So Wayland's leave can be divided across two periods: (1) October to December 10, 2018, during which she took five weeks of continuous leave; and (2) December 11, 2018, through April 2019, in which she took around nine days of intermittent leave.

Given the timing of her leave and circumstances necessitating the implementation of the PIP, Wayland cannot show that OSF implemented the May 2019 PIP because she took FMLA leave. And her performance under the PIP is what led to her termination. Thus, there is no causal connection between her FMLA leave and her termination.

The issues precipitating the PIP arose in the second period of Wayland's leave in which she was at nearly a full-time schedule, and she does not connect these issues to her taking leave. First, OSF's acquisition of a new hospital in February 2019 imposed tight deadlines on Wayland's team. And Wayland herself emphasized that the purpose of the PIP was to help her organize her work after the acquisition. Second, three integrity line reports were made across February and April 2019 concerning the working environment in Wayland's department. Wayland stated that her supervisor found no merit in these reports but admitted that she told her supervisor something needed to be done to address why the reports were being made, acknowledging their importance. And while she asserts her FMLA leave hampered her ability to manage her staff, that assertion is inconsistent with her being at almost a full-time schedule when these reports were made. She also admits these issues had first been raised in integrity line reports made in September 2018, prior to her taking leave.

After the PIP was implemented, it was Wayland's failure to meet performance expectations under the PIP that resulted in her termination. She admitted she did not complete all the tasks on the PIP. While she asserts some tasks were impossible to complete in the timeframe provided, courts lack expertise to evaluate the feasibility of completing these tasks as we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Pagel*, 695 F.3d at 630 (quotation omitted). And Wayland took no FMLA leave during that timeframe and does not claim that the tasks were impossible because of her leave. She also admitted that she did not complete other tasks and did not directly share materials evidencing that she had completed certain tasks with her supervisors. Most importantly, she does not contend that her failure to meet those expectations was caused by her taking leave. Thus, terminating her based on that failure does not run afoul of the FMLA.