Julie PERRY, Plaintiff,

v.

BATH & BODY WORKS, LLC and Lindsay McKay–Loescher in her individual and official capacities, Defendants.

Cause No. 2:11–CV–240–PRC.

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 28, 2014.

Colby A. Barkes, Jeffrey S. Wrage, Blachly Tabor Bozik & Hartman LLC, Valparaiso, IN, for Plaintiff.

Andrew C. Smith PHV, Benjamin A. Shepler PHV, Vorys Sater Seymour and Pease LLP, Columbus, OH, for Defendants.

## OPINION AND ORDER

PAUL R. CHERRY, United States Magistrate Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 42], filed by Defendants Bath & Body Works, LLC and Lindsay McKay--Loesch-

er on May 10, 2013, and a Motion for Leave to File Under Seal Certain Documents Filed in Support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [DE 54], filed by Plaintiff Julie Perry on July 22, 2013. The motions are fully briefed and ripe for ruling.

## PROCEDURAL BACKGROUND

On July 1, 2011, Plaintiff Julie Perry filed a Complaint in this Court against Limited Brands Store Operations, Inc. and Lindsay Loescher, individually and in her official capacity.[1] The Complaint alleged that Defendants retaliated against Perry for utilizing leave time under the Family and Medical Leave Act; retaliated and discriminated against Perry because of her serious health condition (skin cancer) in violation of the Americans with Disabilities Act; discriminated against Perry due to her age in violation of the Age Discrimination in Employment Act; discriminated and retaliated against Perry for using her employee benefits under the Employee Retirement Income Security Act; and violated Indiana Wage Claims and Wage Payment statutes by not paying Perry for accrued vacation time.

On February 22, 2012, Perry filed an Amended Complaint with leave of Court to properly name the Defendants as Bath & Body Works, LLC ("BBW") and Lindsay McKay–Loescher. The Amended Complaint also added a claim for interference with Family and Medical Leave Act rights in addition to the claims from the original Complaint.

On February 22, 2013, a Notice of Filing Bankruptcy was filed as to McKay–Loescher, and, on February 27, 2013, the Court ordered this action stayed as to McKay–Loescher individually.

On May 10, 2013, BBW and McKay–Loescher filed the instant Motion for Summary Judgment and a brief in support, seeking summary judgment on all claims. On July 1, 2013, Perry filed a response, and Defendants filed a reply on July 22, 2013. On July 22, 2013, Perry filed the Motion to Seal, and Defendants filed a response on August 2, 2013.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTION TO SEAL

Plaintiff Julie Perry moves to maintain under seal Exhibits 3a, 3c, 3p, 3q, 3r, 3s, 3t, 3u, 3v, 3w and 5 to her response brief in opposition to summary judgment. Defendant BBW marked these documents "CONFIDENTIAL" during the course of discovery pursuant to the Protective Order in place in this case. BBW agrees with the motion as to Exhibits 3a, 3p, 3r, 3s, 3t, 3u, and 3v, although BBW proposes that if some of these exhibits are unsealed, certain information in the documents should be redacted. BBW responds that it does not object to the unsealing of Exhibits 3c, 3q, 3w, and 5.

■ Mindful of the Seventh Circuit Court of Appeals' firm position regarding requests to seal documents from the public record and in light of the protections afforded for personal identifiers in Federal Rule of Civil Procedure 5.2(a) and the

---

1. Limited Brands Store Operations, Inc. owns Bath & Body Works, and Limited Brands Store Operations is a subsidiary of Intimate Brands Holding, LLC, which is a subsidiary of Limited Brands, Inc, a publicly traded company. Lindsay Loescher's full name is Lindsay Nikell McKay–Loescher, and she also goes by the name "Nikki."

discretion the Court has under Rule 5.2(e) to require additional redaction or to limit access by nonparties to certain documents for good cause, the Court makes the following rulings based on a finding of good cause.

Exhibit 3a contains McKay–Loescher's job offer letter and job application, which are offered only to support the undisputed fact of her start date with BBW. Only the offer letter is necessary for this purpose. Therefore, the Court orders that Perry file a redacted version of the offer letter, which is the first page of Exhibit 3a (bates stamp JP1073), redacting both McKay–Loescher's address and Michael Hurd's phone number. McKay–Loescher's job application (bates stamp JP1074, JP1075) shall remain under seal.

Exhibit 3c is a district visit summary. The Court orders Perry to file a redacted version of Exhibit 3c, redacting the name of the store manager for store 212, who is not involved in this litigation.

Exhibit 3p is a portion of a chart provided by BBW that contains birth dates, addresses, and telephone numbers. It is offered only to show the month and year of birth of Sondra Sikanovski and Mary Ellen S. The Court orders that Exhibit 3p remain under seal.

Exhibits 3r and 3t are paperwork approving FMLA leave for Sondra Sikanovski and Mary Ellen S. The documents reference personal health information, including the length of required FMLA leave and prior use of FMLA leave. Because of the sensitive, personal nature of the information regarding nonparties and because the Court's reliance on these exhibits is limited, the Court orders that Exhibits 3r and 3t remain under seal.

Exhibit 3s contains disciplinary records for Sikanovski, a nonparty. The only relevant information in this exhibit are the dates of February and April 2012 and that Sikanovski's district manager at that time was Wendy Hohman. The Court orders that Exhibit 3s remain under seal.

Exhibit 3u is Mary Ellen S.'s resignation letter. Mary Ellen S. is a nonparty. However, quotation of portions of this letter are necessary for the Court's analysis. Therefore, the Court orders Perry to file a redacted version of Exhibit 3u, redacting all names, including Mary Ellen S.'s full name, except for "Nikki Loescher" or "Nikki" and redacting the author's associate ID number.

Exhibit 3v is the BBW ethics and compliance hotline form for the complaint made by BBW employee Candace K, who is a nonparty. As with Exhibit 3v, quotation of portions of this form are necessary to the Court's analysis. The Court orders Perry to file a redacted version of Exhibit 3v, removing all instances of Candace K's last name (unless only the last name appears, in which case the K shall be left), phone number, and email address; removing all but the "B" of the last name of Krissy B. (including when only the last name of Krissy B. appears); and redacting the full name of any other individuals other than Vanessa Lea or McKay–Loescher.

The Court finds that Exhibits 3q (the federal civil complaint filed by Sondra Sikanovski, which is a public record), 3w (an anonymous complaint), and 5 should be unsealed.

## FACTUAL BACKGROUND

Bath & Body Works, LLC ("BBW") is a nationwide retailer that operates hundreds of stores across the United States and throughout the State of Indiana. BBW's in-store management structure, beginning with the lowest level, includes key holders, co-managers, and store managers. This in-store management is known as the Sales Leadership Team. Store managers report

to district managers, district managers to regional managers, and regional managers to a vice-president of business. BBW has a human resources ("HR") department and a separate ethics and compliance hotline, which allows employees to voice their concerns, anonymously if they choose.

Plaintiff Julie Perry began working for BBW on November 18, 2001. She was the store manager at the Valparaiso, Indiana location for seven years before being moved to the Merrillville, Indiana store in the position of store manager. As a store manager, Perry was responsible for knowing and enforcing BBW policies and procedures. Perry worked at the Merrillville store for approximately one year before her employment was terminated.

Defendant Lindsay McKay–Loescher ("McKay–Loescher") was born in 1980 and was 29 years old when she started working for BBW in February 2010. When she was hired, she received three weeks of technical in-store training.

On February 20, 2010, Perry received a sales bonus from BBW.

On April 1, 2010, McKay–Loescher became the district manager of the geographic area that included Perry's store. When McKay–Loescher became her supervisor, Perry began keeping notes of work events.

On April 6, 2010, Perry received a performance review from Marge Keller, who had been Perry's district manager until April 1, 2010. Keller rated Perry as either a three—"fully meets expectations," or a two—"exceeds expectations," in every category. (Pl. Br., Ex. 4). Perry was rated as a three "overall" with a rating of three for "overall results" and as a two for "overall competency." (Pl. Br., Ex. 4). Perry was told that no employee at BBW is given the highest ranking of one.

According to Perry's notes, before McKay–Loescher became district manager on April 1, 2010, she "secret shopped" Perry's store and told Perry during a phone conversation that she "did not like what she saw." (Def. Br., Exh. B., p. 37 (Perry Dep. Exh. 12)). McKay–Loescher had weekly communications with BBW's corporate HR department regarding the stores for which she was the district manager. McKay–Loescher completed a "District Visit Summary" with a visit date of April 19, 2010, for a visit to Perry's Merrillville store. In that summary, McKay–Loescher wrote that Perry was the "right leader" for her store and that she would continue to educate Perry on business acumen and using certain tools to drive results. (Pl. Br., Ex. 3c).

According to Perry's notes, on May 14, 2010, McKay–Loescher expressed dissatisfaction with Perry's Sales Leadership Team and told Perry that there needed to be some changes.

On May 15, 2010, Perry received a sales bonus and a "contest gross up" award.

On May 18, 2010, Perry called BBW's ethics hotline and complained that McKay–Loescher "harassed, intimidated, and disrespected" the management at her store and that most of her store's Sales Leadership Team feared losing their jobs. (Pl. Br., Exh. 5; Pl. Br., Exh. 1, p. 182). That same day, Perry wrote in her notes that "[McKay–Loescher] is just tearing us down. She is making us feel like we are the worst managers ever." (Pl. Br., Exh. 1, p. 117). By "us," Perry was referring to the Sales Leadership Team at her Merrillville store.

From May 24 to May 27, 2010, Perry attended BBW's Field Leadership Conference. In her notes and at her deposition, Perry reported that at the conference, Diane Neal and Ken Montera (BBW representatives) told everyone that "the Compa-

ny is going in a different direction we are trying to hit the younger people." (Def. Br., Exh. 3, p. 38; Pl. Br., Exh. 1, pp. 137–41).

On May 27, 2010, McKay–Loescher called Amy Wagner[2] at BBW's HR department to discuss problems she was experiencing with Perry's store. In her handwritten notes, Wagner wrote down McKay–Loescher's report that Perry's store was struggling with policy and procedure; that Perry did not hold the store accountable for "attendance, etc.;" and that McKay–Loescher stated that the store was resistant to McKay–Loescher visiting and asking questions. (Pl. Br., Ex.3d; Pl. Br., Exh. 2, p. 44). Wagner's notes also indicated that Perry was at the Field Leadership Conference and that she "produces good numbers." *Id.*

When Perry returned from the leadership conference, she learned that she needed to have surgery to remove a cancerous lesion on her skin and that her doctor had scheduled the surgery.

On June 8, 2010, Perry informed McKay–Loescher that she had surgery scheduled for June 15 and that she would be out the day of June 16. Perry did not tell McKay–Loescher why she was having surgery.

During the week of June 14, 2010, McKay–Loescher called Wagner and informed her of the June 8, 2010 conversation. According to Wagner's record of McKay–Loescher's weekly contact with the HR department for the week of June 14, 2010, McKay–Loescher reported that Perry's June 15, 2010 surgery had been scheduled in advance for a couple of months and that Perry had just told her.

On June 15, 2010, Perry underwent surgery; during the procedure her surgeon discovered another lesion that also required surgical removal.

On June 15, 2010, a BBW "store manager" position listed in Merrillville, Indiana, was posted as open and available on the internet website Monster.com.

On June 16, 2010, Perry spoke with Regional Manager Michael Hurd regarding her need for leave as well as about "what was going on with [McKay–Loescher] & [Perry's] store." (Def. Br., Exh. B., p. 41 (Perry Dep. Exh. 12)). Hurd advised Perry to take care of herself, disconnect from the store, and let BBW know if she needed anything. He said that he would talk to her about the issues with her store when she returned.

In her notes for June 16, 2010, Perry recorded that she told McKay–Loescher that she would be out for approximately six weeks and that the HR department should be calling her back that day. Wagner's notes show that McKay–Loescher stated that Perry called McKay–Loescher on June 15, 2010, to request ten days off for the first surgery, to tell her she had a second surgery scheduled, and to say that she would be out for a couple of weeks after the second surgery. Perry did not tell McKay–Loescher that her leave was for the treatment of skin cancer.

On June 16, 2010, Perry requested FMLA leave beginning on June 15, 2010. BBW approved Perry's leave, and the conclusion of the FMLA leave period was eventually scheduled for July 10, 2010.

On June 18, 2010, while still on leave, Perry contacted Wagner to discuss McKay–Loescher's leadership style and stated that she feared McKay–Loescher would terminate her. During the conversation, Perry said that she had seen an

2. Amy Wagner was named Amy Bissmeyer at all times relevant to this case; she has since changed her last name to Wagner. (Def. Br., Exh. A, ¶ 9).

advertisement on Monster.com for her job. Wagner stated that she would investigate the advertisement and reemphasized BBW's open door and non-retaliation policies.

After this conversation, Wagner called McKay–Loescher and gave her a "heads up that [Perry] called [Wagner] with concerns." (Pl. Br., Exh. 3i). Wagner recorded that McKay–Loescher stated that she did not intend for the store manager opening to be posted for Perry's store and wondered whether Kristin Haas, the recruiter who listed the opening with Monster.com, may have posted the wrong location. McKay–Loescher was responsible for filling open positions. During this conversation, McKay–Loescher denied saying things that Perry told Wagner that McKay–Loescher had said, and McKay–Loescher stated that she was coaching Perry to be accountable and to coach her staff better. McKay–Loescher provided Wagner with several concerns she identified at Perry's store. Wagner recorded that McKay–Loescher had also informed Hurd about her concerns with Perry.

On June 22, 2010, Wagner emailed Haas, who responded that the listing on Monster.com was for a store manager position at the store in Michigan City, Indiana. Wagner wrote to Haas, with a copy to McKay–Loescher:

Hi Kristin,

I am helping Nikki McKay–Loescher with this while she's at CLR this week. We hoped you could remove this posting for [a store manager] at Southlake Mall in Merrillville, IN from Monster.com as soon as possible because it is for the incorrect store. The [store manager] of this store is out on a leave of absence and found this posting. I think Nikki may have given you a heads up on some potential turn in this store, but the open [store manager] role is at another store—Nikki, please confirm the store when you have a moment.

(Pl. Br., Exh. 3g). Haas responded:

Hi Amy,

I noticed that [McKay–Loescher] has already cancelled this posting. However, this was posted without a store title (mall or center) as [McKay–Loescher] was interested in having me gather talent for Lighthouse Place out of Valparaiso or Meriville [sic] as she did not believe a Monster posting would be helpful in the Michigan City market. I just wanted to shed some light as to the thought process.

Thanks,

Kristin

*Id.* The Monster.com posting lists the "job title" as "store manager—Bath & Body Works" with the location of "Merrillville, IN." In her deposition, McKay–Loescher explained that this was a recruiting technique. When asked if this was a standard practice, McKay–Loescher responded, "I wouldn't say a standard." (Pl. Br., Exh. 1, pp. 92–93). Haas wrote in another contemporaneous June 2010 email that she was not aware that Merrillville only had one BBW store and did not realize that the advertisement would cause confusion. Several people replied to the Monster.com listing, and McKay–Loescher hired one of those individuals as the manager for the Michigan City store.

While Perry was on FMLA leave, her replacement was another BBW store manager, Vanessa Lea. While filling in for Perry, Lea contacted McKay–Loescher to report a variety of policy and procedure violations; Lea provided McKay–Loescher with a series of handwritten notes she made detailing issues she discovered at Perry's store beginning on June 18, 2010. On July 2, 2010, McKay–Loescher called Wagner and reported that Perry's co-man-

ager could not do the schedule, that Perry was supposed to have trained her, and that Perry had not given time for DVR or DOR at the store. McKay–Loescher provided Wagner with a copy of Lea's notes.

On July 11, 2010, Perry returned to work. Perry recorded in her notes that she talked with McKay–Loescher that day about what had transpired at the store during her absence. Perry's notes indicate that McKay–Loescher identified several problems with the store, including that Holly was not trained, that Sam was having a hard time running the store, that Mari did not know how to do the schedule in the computer program, that one employee was given PTO during the June Sale, that Sam and Mari needed to change their DOR, that the managers would not listen to Lea or McKay–Loescher, that McKay–Loescher's name was not on the HR poster and that McKay–Loescher had to ask the co-manager four times before she put the name on the poster, that the co-managers reported that Perry did not help them "CSL," that two co-managers did not know what they were working on with development, that the managers did not know how to fill out the flow sheet, that the FM was not done on July 5, and that Perry did not give her managers feedback.

In these same notes, Perry indicated her denial to McKay–Loescher of the existence of many of these problems. Specifically, Perry noted that she told McKay–Loescher that Holly was trained and that there is a lot of self-training at BBW, that Perry and Mari had been trained to do schedules at the same time in Valparaiso and that Mari did the schedules in Valparaiso, that the employee was given PTO during the June Sale because it was not a blackout from "corp," that it was a lie that Perry did not help her managers with CSL (she notes that, when she asked McKay–Loescher what the managers said she was

doing instead of helping, McKay–Loescher did not answer), and that the managers do know how to fill out the flow sheet. Perry agreed that Sam and Mari needed to change their DOR.

During the week of July 11, 2010, McKay–Loescher informed HR about this conversation with Perry during which she addressed policy violations by Perry and/or her team.

On July 14, 2010, Perry was terminated from her employment with BBW. The termination meeting was conducted by McKay–Loescher. The two boxes checked under "Termination Reason" on the "Termination Notice" form are "Unsatisfactory Performance" and "Policy Violation;" additionally, under "Termination Reason Explanation" is typed: "[Perry's] employment has been terminated for violation of company policy and procedure * values." (Pl. Br., Exh. 3e, p. 2, Exh. 3o, p. 1). McKay–Loescher stated in her deposition that Perry was being coached to improve her procedure and that she was fired only for her policy violations.

Perry was born in 1960 and was 50 years old at the time of her termination from BBW on July 14, 2010.

Also on July 14, 2010, McKay–Loescher conducted termination hearings for three other members of the Sales Management Team at Perry's Merrillville store for the same policy violations: co-managers Samantha Cheatham and Maricela Garcia and key holder Jamie Britton. All three of these individuals were under 40 years of age at the time of their termination, and none had recently taken FMLA leave.

Perry's replacement at the Merrillville store, Sondra Sikanovski, was recruited by McKay–Loescher from another store inside the mall where she was a store manager and was hired by BBW. Sikanovski was 26 years old at the time of her hire.

The day of her termination, Perry left a voicemail message with Wagner (who was out of the office) to report that she had been terminated for policy violations and unsatisfactory performance. Perry said it was not "right" that she was terminated because she had received ratings of three on her review, and she wanted an explanation for her termination.

On July 15, 2010, Perry left a second message with Wagner to say that she believed she was terminated in retaliation for complaining to Wagner.

On July 20, 2010, Wagner returned Perry's call and explained that she and McKay–Loescher had partnered on the termination; that it was unrelated to Perry's complaints; and that Perry was terminated because of policy and values violations. Perry asked for specific violations, but Wagner did not provide them before Perry's phone service cut out and the call ended.

On July 29, 2010, Candace K., an employee at a different BBW store in the region, called the BBW's ethics hotline to complain about several events that had occurred earlier in the month. One event took place during the week of July 13, 2010, when McKay–Loescher spoke to Candace K. about her work style and how it was not how the store needed to be run. Candace K. reported that during that conversation McKay–Loescher commented that she did not think that Candace K. was as old as "Sales Associate, Julie UNKNOWN, who is around 47 or [Krissy B.] who is around 42," and that Candace K. responded that she was fifty years old. (Pl. Br., Exh. 3v, p. 2). After this conversation, Candace K. felt that McKay–Loescher may not have wanted her working at the store any longer because of her age. Candace K. also reported that Krissy B. resigned because she was harassed by McKay–Loescher and Vanessa Lea (the store manager where Candace K. worked). Candace K. reported that, on July 25, 2010, she mentioned that she thought she may be fired and a co-manager told her that she would not be fired. On July 27, 2010, during a conference call, McKay–Loescher told Candace K. that it was against company policy to say that she thought she would be fired. Candace K. reported that on July 28, 2010, a sales associate, who is "older," was written up for being one minute late. At one point, McKay–Loescher told Candace K. that she was going to check the company policy regarding whether Candace K. was going to be terminated for saying that she thought she was going to be fired. Candace K. resigned from BBW on July 29, 2010.

Perry reported in a November 23, 2010 letter to the EEOC that while she was Store Manager at the Merrillville location, the store "bonused" every quarter and its sales figures were up 28%–32% over the previous year every month. McKay–Loescher testified that Perry's store met its sales goals, but she felt that they should have been higher.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)). "[S]um-

mary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; Fed.R.Civ.P. 56(c). The moving party may discharge its initial responsibility by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325, 106 S.Ct. 2548; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir.1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum–Hill Assoc.*, 914 F.2d 107, 110–111 (7th Cir.1990) (citations omitted); *see also Hong v. Children's*

*Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed.R.Civ.P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it...." Fed.R.Civ.P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir.2009); *NLFC, Inc. v. Devcom Mid–Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of

triable fact. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## ANALYSIS

■ The instant Motion for Summary Judgment is presented by both Defendant BBW as well Defendant McKay–Loescher in her individual capacity. However, as noted by Defendants in footnote 1 of their brief, the case was stayed as to McKay–Loescher as an individual as a result of the automatic bankruptcy stay prior to the filing of the instant motion. *See* 11 U.S.C. § 362(a). Thus, because the motion brought by McKay–Loescher in her individual capacity is not properly before the Court, the Court denies the motion without prejudice as to the claims against her individually.

Defendant BBW moves for summary judgment on all five claims in Perry's Amended Complaint. Perry's response brief addresses only her Family and Medical Leave Act and Age Discrimination in Employment Act claims. The Court considers each claim in turn.

### A. Family and Medical Leave Act

■ The Family and Medical Leave Act ("FMLA") allows an eligible employee with a serious health condition to take as many as twelve workweeks of unpaid leave during any twelve-month period. 29 U.S.C.

§ 2612(a)(1)(D). An employee on FMLA leave has the right to be restored to the same or an equivalent position that the employee had before taking leave. 29 U.S.C. § 2614(a)(1)-(2). The FMLA makes it unlawful for an employer to interfere with, restrain, or deny an employee's exercise or attempt to exercise rights under the FMLA. 29 U.S.C. § 2615(a)(1); *see also James v. Hyatt Regency Chi.,* 707 F.3d 775, 780 (7th Cir.2013). When an employee alleges a deprivation of these substantive guarantees, commonly referred to as an interference claim, the employer's intent is immaterial; the employee need only demonstrate entitlement to the disputed leave. *King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir. 1999); *see also Goelzer v. Sheboygan Cnty., Wis.,* 604 F.3d 987, 995 (7th Cir. 2010).

■ In addition to these prescriptive protections, the FMLA contains proscriptive sections that bar certain discriminatory conduct. *King,* 166 F.3d at 891. First, under § 2615(a)(1), it is unlawful for an employer to retaliate or discriminate against an employee for exercising her rights under the FMLA, including the taking of leave. *See* 29 U.S.C. § 2615(a)(1);[3] 29 C.F.R. § 825.220(c); *see also King,* 166 F.3d at 891.[4] The FMLA's "prohibition

---

**3.** 29 U.S.C. § 2615(a) provides in full:
   (a) Interference with rights
   (1) Exercise of rights
   It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
   (2) Discrimination
   It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.
   29 U.S.C. § 2615(a).

**4.** In its recognition of these proscriptive protections, the Seventh Circuit Court of Appeals

in *King* cites *Hodgens v. General Dynamics Corp.,* 144 F.3d 151 (1st Cir.1998). *See King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir.1999). In *Hodgens,* the First Circuit Court of Appeals explains the relationship between the statute and its implementing regulations in establishing a claim of retaliation for exercising FMLA rights, such as taking leave:

> The statute itself does not explicitly make it unlawful to discharge or discriminate against an employee for exercising her rights under the Act (such as placing an employee in a less desirable job because she took medical leave for a serious health condition). Nevertheless, the Act was clearly

**898**

against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). For example, "[e]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions...." *Id.*[5] Second, § 2615(a)(2) prohibits discrimination or retaliation against

an employee for "opposing" conduct that is prohibited by the FMLA. *See* 29 U.S.C. § 2615(a)(2); *see also King*, 166 F.3d at 891; *Arrigo v. Link Stop, Inc.*, No. 12–cv–700, 2013 WL 5498139, at *8, 975 F.Supp.2d 976, 985 (W.D.Wis. Oct. 4, 2013) (recognizing that § 2615(a)(2) is only at issue when an employee alleges retaliation for "opposing" unlawful employment practices).[6] In contrast with an interference

intended to provide such protection. The Department of Labor regulations implementing the FMLA interpret the Act this way, *see* 29 C.F.R. § 825.220(c) (*"An employer is prohibited from discriminating against employees ... who have used FMLA leave."*), and those regulations are entitled to deference, *see Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

*Such protection can be read into § 2615(a)(1):* to discriminate against an employee for exercising his rights under the Act would constitute an "interfer[ence] with" and a "restrain[t]" of his exercise of those rights. *See* 29 C.F.R. § 825.220(b) (1997) (Interfering with the exercise of FMLA rights "would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.")

*Hodgens*, 144 F.3d at 160 n. 4 (emphasis added). The version of the first sentence of § 825.220(c) that is quoted in *Hodgens*, which the court in *King* also quotes, was effective through Jan. 15, 2009. The first sentence in the subsequent versions of § 825.220(c) provides: "The Act's prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c) (versions effective Jan. 16, 2009 and Mar. 8, 2013).

5. 29 C.F.R. § 825.220(c) provides in full:

The [FMLA's] prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. For example, if an employee on leave without

pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies. See § 825.215.

29 C.F.R. § 825.220(c).

6. Some cases have suggested, without analysis, that all retaliation claims, including retaliation claims based on "use of FMLA leave," fall under § 2615(a)(2), even though § 2615(a)(2) addresses only discrimination based on "opposing" prohibited· practices and, as set forth in footnote 4 above, courts have recognized that § 2615(a)(1) is the statutory basis for claiming retaliation for having exercised FMLA rights. *See, e.g., Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir.2012) ("Employers are prohibited from both interfering with, [29 U.S.C. § 2615(a)(1) ], and retaliating against, *id.* § 2615(a)(2), an employee's *use* of FMLA leave."); *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 992 (7th Cir.2010) ("[T]he FMLA affords protection to employees who are retaliated against because they exercise rights protected by the Act." (citing *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008); 29 U.S.C. § 2615(a)(2))); *Johnson v. Reichhold, Inc.*, No. 09 C 1860, 2010 WL 3385548, at *6 (N.D.Ill. Aug. 23, 2010) ("The statute makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any FMLA rights, 29 U.S.C. § 2615(a)(1), and prohibits an employer from retaliating against an employee who exercises his or her FMLA rights[,] 29 U.S.C. § 2615(a)(2)."); *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir.2008) ("In

claim, a retaliation claim requires proof of discriminatory or retaliatory intent. *See King,* 166 F.3d at 891; *see also Goelzer,* 604 F.3d at 995.[7]

Perry contends that her restoration to the position of store manager upon her return from FMLA leave was illusory and alleges in Count I of her Amended Complaint that her termination shortly thereafter constitutes both retaliation and interference in violation of the FMLA. The Court considers each of Perry's claims.

### 1. *Retaliation*

In her response brief, Perry argues that her employment with BBW was terminated in retaliation both for taking FMLA leave as well as for complaining about the Monster.com posting that was listed during her FMLA leave. Perry need not prove that "retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Goelzer,* 604 F.3d at 995 (quoting *Lewis v. Sch. Dist. # 70,* 523 F.3d 730, 741–42 (7th Cir.2008) (quoting *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir.2005))).[8]

■■■ To survive summary judgment on her FMLA retaliation claim, Perry may

---

addition to granting employees particular substantive rights, the FMLA protects employees from being discriminated or retaliated against for exercising their FMLA rights." (citing 29 U.S.C. §§ 2615(a)(2), 2615(b); 29 C.F.R. § 825.220(c); *Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005))). Despite the reliance on § 2615(a)(2), these courts nevertheless considered all retaliation claims under the direct and indirect methods of proof for the intent-based claim of retaliatory discharge, as set forth in *King,* 166 F.3d at 891.

7. In addition to these two forms of retaliation under § 2615(a), subsection (b) of § 2615 makes it unlawful to interfere with proceedings or inquiries as a form of retaliation, a claim that is not at issue in this litigation:

> (b) Interference with proceedings or inquiries
> It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—
> (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;
> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or
> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.
> 29 U.S.C. § 2615(b).

8. The 2010 decision in *Goelzer* was issued after the decision in *Gross v. FBL Financial Services, Incorporated,* 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), in which the United States Supreme Court held that, under the direct method of proof, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." In 2010, the Seventh Circuit extended this rule of "but-for" causation to ADA claims. *See Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962 (7th Cir.2010) ("[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability[.]"). However, it did not do so for FMLA claims in *Goelzer* nor in any subsequent FMLA case. *See, e.g., Goelzer,* 604 F.3d at 995 (2010) (applying the "mixed motive" standard); *see also Pagel,* 695 F.3d at 622 (2012) (analyzing the retaliation claim under the direct method but remaining silent on the "mixed motive" standard); *Keiju Pu v. Columbia Coll. Chi.,* 934 F.Supp.2d 964, 975 (N.D.Ill.2013) (noting that at least one district court judge has held that the proper test remains whether the employee's decision to take FMLA leave was a substantial or motivating factor (citing *Lee v. Waukegan Hosp. Corp.,* No. 10 C 2956, 2011 WL 6028778, at *2 (N.D.Ill. Dec. 5, 2011) ("*Lewis* has not been questioned by any post-*Gross* Seventh Circuit case, and this opinion will treat the 'motivating factor' standard as still applicable."))).

use either the direct or indirect method of proof. *See Pagel v. TIN Inc.,* 695 F.3d 622, 632 (7th Cir.2012) (citing *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir.2004)); *see also Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 633 (7th Cir. 2009); *King,* 166 F.3d at 891. Proceeding under the direct method, Perry must prove that (1) she engaged in a protected activity; (2) BBW took an adverse employment action against her; and (3) there is a causal connection between Perry's protected activity and BBW's adverse employment action. *Cracco,* 559 F.3d at 633 (citing *Andonissamy v. Hewlett–Packard Co.,* 547 F.3d 841, 850 (7th Cir.2008)). It is undisputed that Perry meets the first two prongs. First, Perry engaged in protected activity when she took FMLA leave and when she contacted Wagner about the Monster.com posting, which she believed was a posting for her job, while she was on FMLA leave.[9] Second, BBW terminated Perry's employment, which constitutes a materially adverse employment action. *James,* 707 F.3d at 782 ("For example, a 'materially adverse change might be indicated by a termination of employment ....'" (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (citations omitted in original))).

Thus, to survive summary judgment under the direct method, Perry must satisfy the third prong by offering evidence from which a reasonable jury could find a causal connection between her FMLA leave or her opposition to the Monster.com posting and BBW's decision to terminate her employment. *Cracco,* 559 F.3d at 633. To do

so, Perry may rely on either direct or circumstantial evidence; direct evidence would be something like an admission by BBW of discrimination, and circumstantial evidence would allow a jury to infer that BBW had discriminated or retaliated against Perry. *Hobgood v. Ill. Gaming Bd.,* 731 F.3d 635, 643 (7th Cir.2013); *Buie,* 366 F.3d at 503. The Seventh Circuit has noted that "admissions of illegal discrimination and retaliation are rare" such that it is "not surprising [when a plaintiff] has not presented a 'smoking gun' confession by [the defendant]." *Hobgood,* 731 F.3d at 643.

■ Because Perry offers no direct evidence of FMLA retaliation, she must satisfy the direct method with circumstantial evidence, sometimes referred to as "a convincing mosaic of circumstantial evidence." *Pagel,* 695 F.3d at 631 (quoting *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir.2008)). The convincing mosaic may include (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which a retaliatory intent might be drawn," (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently," or (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Perez v. Thorntons, Inc.,* 731 F.3d 699, 711 (7th Cir.2013) (quoting *Cloe v. City of Indianapolis,* 712 F.3d 1171, 1180 (7th Cir. 2013)); *see also Pagel,* 695 F.3d at 631; *Cracco,* 559 F.3d at 633. These categories are not a test, nor are they exclusive. *Hobgood,* 731 F.3d at 644. However, one

---

9. In her brief, Perry characterizes this phone call to Wagner as "complaining about [McKay–Loescher] violating her FMLA rights with the Monster.com posting." (Pl. Resp. 16). However, nowhere in the cited evidence is there any indication that Perry's call mentioned the FMLA or that Perry's call indicated that she believed that the posting violated her

FMLA rights. Her call informed Wagner that the Monster.com posting was made on the day she had surgery. Nevertheless, Perry was entitled to FMLA leave, and she may have reasonably believed that the Monster.com posting was in violation of her FMLA rights. Thus, complaining about the posting was protected activity under 29 U.S.C. § 2615(a)(2).

category by itself, such as suspicious timing, is usually not enough to establish a convincing mosaic. *Id.; see also O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir.2011) ("[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter."). In her response brief, Perry attempts to create a convincing mosaic of circumstantial evidence based on each of the three categories.

■ First, Perry argues that the temporal proximity of the events surrounding her FMLA leave and termination constitute the necessary causal connection. Perry took FMLA leave from her position as store manager at the Merrillville BBW store from June 15 to July 10, 2010. A Monster.com posting for a BBW store manager position in Merrillville was listed on June 15, 2010. On June 18, 2010, Perry called Wagner with concerns she had regarding district manager McKay–Loescher and informed Wagner about the Monster.com posting. Wagner then called McKay–Loescher to let her know that Perry had called with concerns. Perry returned to her position as store manager at the Merrillville store on July 11, 2010. On July 14, 2010, BBW terminated Perry's employment along with the employment of three other members of Perry's Sales Management Team for the same policy and procedure violations. Perry argues that the temporal proximity of these events supports the necessary causal connection.

As an initial matter, Perry construes her call to Wagner and Wagner's subsequent call to McKay–Loescher in a way unsupported by the cited evidence. Perry writes in her brief that "Loescher is informed by HR that Perry has complained again that Loescher is committing illegal employment actions." (Pl. Br. 15). Perry identifies no evidence that she complained about "illegal employment actions" or that she even suggested that McKay–Loescher was responsible for the Monster.com posting. Rather, the evidence cited by Perry is Wagner's handwritten call sheet for a call between Wagner and McKay–Loescher, on which Wagner wrote: "gave Nikki heads up that Julie called me with concerns;" "[McKay–Loescher] was surprised to hear that [Perry] feels she is in danger of losing her job;" and "Kristin Haas may have posted the wrong store's mgr role— did not mean to post [store manager] role at [Merrillville store]." (Pl. Br., Exh. 3i). Wagner's notes from Perry's initial June 18, 2010 call include a long list of complaints and concerns that Perry raised about McKay–Loescher; one line provides: "her job is on monster.com, posted the day she had surgery—told her I would look into it." (Pl. Br., Exh. 8, p. 4). Similarly, Perry's deposition testimony confirms only that she mentioned the Monster.com posting to Wagner, and Perry testified that Wagner's notes were an accurate summary of their conversation. (Pl. Br., Exh. 1, pp. 162–63).

Considering the evidence of record, the temporal proximity of Perry's protected FMLA activity and her termination is not probative evidence of a causal link in this case. BBW likens the facts of this case to those in *Cracco,* in which the plaintiff was terminated because of policy violations uncovered while he was on FMLA leave. 559 F.3d at 628–29. The plaintiff in *Cracco* denied having committed the policy violations and asserted that his fifteen-year record of positive reviews and the fact that he was terminated on the day he returned from FMLA leave constituted the requisite causal connection. The court in *Cracco* found that the timing of the discharge did not constitute relevant and probative evidence of a causal link because the informa-

tion that led the employer to believe that the plaintiff was responsible for the problems at his workplace was discovered during the FMLA leave. *Id.* at 634. The court noted that "[t]he fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee." *Id.* (quoting *Kohls v. Beverly Enters. Wisc., Inc.,* 259 F.3d 799, 806 (7th Cir.2001)). Thus, "[i]f the FMLA allows an employer to base adverse employment actions on performance problems discovered while the employee is on leave, the fact that the employer discharges the employee when he returns cannot be sufficient evidence to establish causation." *Id.*

In this case, the most important factor negating causation is that McKay–Loescher had already expressed concerns regarding Perry's policy and procedure violations to both Perry and to Wagner prior to Perry notifying McKay–Loescher on June 8, 2010, of her need for FMLA leave. Before McKay–Loescher became Perry's district manager on April 1, 2010, she had already told Perry that she did not like what she had seen at Perry's store when visiting as a "secret shopper." On May 18, 2010 (weeks before she requested FMLA leave, or even knew that she would need leave), Perry contacted BBW's ethics hotline, to complain that her Sales Leadership Team feared losing their jobs as a result of McKay–Loescher's criticism. On May 27, 2010, again prior to Perry requesting FMLA leave or notifying McKay–Loescher that she would be taking leave, McKay–Loescher spoke with Wagner, reporting that Perry's store was struggling with policy and procedure, that the store was resistant to McKay–Loescher's visits, and that Perry was not holding her employees accountable for attendance.

Then, like in *Cracco,* policy and procedure violations were discovered while Per-

ry was on FMLA leave. During Perry's absence, Vanessa Lea, a store manager from another location, worked at the Merrillville location as the acting store manager. Lea made ongoing handwritten notes of policy violations she observed in the Merrillville store beginning on June 18, 2010. Lea contacted McKay–Loescher with her concerns and turned over her notes. Perry has not questioned the validity or legitimacy of Lea's notes nor suggested any retaliatory motive that Lea would have for making the notes. Lea's concerns discovered during Perry's FMLA leave are consistent with and of the same nature as McKay–Loescher's earlier expressed concerns. McKay–Loescher turned over these notes to the HR department. McKay–Loescher discussed these issues with Perry the day Perry returned from FMLA leave, many of which Perry denied, and then, three days later, BBW terminated the employment of not only Perry but also of three other members of Perry's Sales Leadership Team for the same policy and procedure violations. Thus, the timing in this case does not constitute probative evidence of a causal link.

■ Next, Perry argues that she can show "evidence of retaliatory motive with other circumstantial evidence such as ongoing antagonism." (Pl. Br. 16). Perry contends that, after she contacted the HR department about the Monster.com posting on June 18, 2010, McKay–Loescher exaggerated minor performance and procedure issues that existed prior to Perry's leave. In support, Perry notes that in the April 19, 2010 District Visit Summary, McKay–Loescher wrote that Perry was the "right leader" for the Merrillville store. However, Perry also acknowledges McKay–Loescher's subsequent May 27, 2010 call to Wagner with concerns about Perry's store following BBW policy and

procedure, Perry and her staff's resistance to McKay–Loescher, and Perry not holding her staff accountable for attendance. What Perry fails to acknowledge is that the April 19, 2010 statement was made shortly after McKay–Loescher began supervising Perry and that the May 27, 2010 concerns were raised by McKay–Loescher over a month later and almost two weeks *prior* to Perry notifying McKay–Loescher of her need to take FMLA leave. Thus, the evidence does not support Perry's assertion that BBW's opinion of her performance changed course once she took FMLA leave or once she contacted Wagner about the Monster.com posting.

Similarly, Perry asserts, with no citation to evidence, that "BBW had [McKay–Loescher] examine and document Perry's job performance negatively after Perry requested FMLA leave," and that McKay–Loescher exaggerated issues she found with Perry's performance, "basically making up reasons to convince corporate to terminate Perry." (Pl. Br. 17). In contrast, the admissible facts viewed in the light most favorable to Perry, as discussed above, are that McKay–Loescher identified policy and procedure violations prior to Perry's request for leave and that Vanessa Lea, the replacement store manager during Perry's FMLA leave, documented and reported numerous concerns that she then reported to McKay–Loescher. Again, Perry does not contest the validity of Lea's contemporaneous notes.

■ Perry also asserts that BBW's treatment of employees Sondra Sikanovski and Mary Ellen S. is indicative of discrimination, suggesting that BBW retaliated against them for taking FMLA leave. (Pl. Br. 7, 13). Although Perry raises this argument in the context of her FMLA interference claim, it forms part of the whole picture Perry paints to show BBW and McKay–Loescher's intent regarding her FMLA leave and to demonstrate pretext. Perry notes that Sikanovski took FMLA leave while employed at BBW and that Sikanovski alleges in a federal civil complaint that BBW placed a job advertisement for her position multiple times during her FMLA leave. However, McKay–Loescher, the supervisor whom Perry identifies as evincing discriminatory intent toward Perry, was not Sikanovski's supervisor at the time of Sikanovski's termination and played no role in Sikanovski's termination; also, Sikanovski's claims post-date Perry's employment by almost two years. Thus, although such evidence may be relevant, Sikanovski's circumstances are insufficiently similar to those of Perry to create an inference of discrimination that would preclude summary judgment. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir.2008) (noting that the Supreme Court has held that "me too" evidence can be relevant to a discrimination claim (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) (holding, in the context of an evidentiary ruling that "[t]he question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case")).

In contrast, Mary Ellen S. took FMLA leave in late 2010, while under the supervision of McKay–Loescher. However, her employment was not terminated. Mary Ellen S. submitted her resignation to McKay–Loescher on December 18, 2010, and submitted a written complaint to BBW dated December 23, 2010. Mary Ellen S. raises several concerns resulting from McKay–Loescher's management style, including "working in fear of being bullied" or having personally "been threatened

with a bad review, PIP, and been told I am not the best manager for the store." (Pl. Br., Exh. 3u, p. 1). However, Mary Ellen S. does not mention any belief that McKay–Loescher's treatment of her was related to her FMLA leave. In fact, Mary Ellen S. indicates that her entire Sales Leadership Team was resigning because "we feel Nikki has told us she's 'partnered and aligned' with HR, and this is BBW's new style of 'coaching.'" *Id.* This evidence does not raise an inference of discriminatory intent by McKay–Loescher related to the FMLA.

■ As for the Monster.com posting, Perry posits that a reasonable juror could conclude that BBW would not have posted an opening for a store manager in Merrillville on Monster.com if her taking of FMLA leave had not affected BBW's perception of her. In support, Perry contends that BBW and McKay–Loescher have provided inconsistent reasoning for the Monster.com posting, allowing an inference of pretext. (Pl. Br. 16 (citing *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir.1992) (explaining, on a motion for JNOV, that "[a] jury's conclusion that an employer's reasons were pretextual can be supported by inconsistencies in or the unconvincing nature of the decisionmaker's testimony"))). However, the evidence viewed in the light most favorable to Perry belies the inference Perry attempts to create.

McKay–Loescher, who was responsible for hiring, asked recruiter Kristin Haas to place the Monster.com posting for a store manager position. Once Wagner informed McKay–Loescher that Perry had called about the posting, McKay–Loescher asked Haas to remove the posting. Perry's attempt to infer inconsistency is based first on the BBW email correspondence between Wagner and Haas following Perry's call to Wagner, which Perry contends indicates that the posting was a *mistake,* and second on what Perry believes is McKay–Loescher's contradictory deposition testimony that the posting was an *intentional* marketing decision. A careful reading of the contemporaneous June 2010 emails between Wagner and Haas shows that the posting for Merrillville was considered to be an intentional marketing decision, consistent with McKay–Loescher's deposition testimony; that McKay–Loescher had asked Haas to list the posting in either Valparaiso or Merrillville; that the posting was actually for a store manager opening in Michigan City; that Haas posted the listing for Merrillville to attract a larger talent pool; and that, in hindsight, Haas, who was unfamiliar with the geographic area, would have listed the posting in Valparaiso instead of Merrillville if she had known how far away Merrillville is from Michigan City.

In fact, BBW received several applications from the Monster.com posting, resulting in the hiring of a store manager for the Michigan City store—the store with an opening for which the posting was intended. Thus, contrary to Perry's assertion, the June 2010 email correspondence between Wagner and Haas supports McKay–Loescher's testimony that the Monster.com posting was intentionally placed in Merrillville; it does not support an inference that the posting was for *Perry's* job.

■ Finally, Perry points to Wagner's statement in the June 18, 2010 email to Haas: "I think [McKay–Loescher] may have given you *a heads up on some potential turn in this store,* but the open [store manager] role is at another store— [McKay-Loescher], please confirm the store when you have a moment." (Pl. Br., Exh. 3g) (emphasis added). Viewing the facts in the light most favorable to Perry, this statement could imply that McKay–

Loescher in fact told Haas that there was going to be a personnel change at the Merrillville store, and perhaps even specifically for Perry's position as store manager.[10] However, nothing about the statement suggests that such a "potential turn" was in any way motivated by Perry's FMLA request. In fact, on May 18, 2010, Perry herself stated to Wagner that most of her Sales Leadership Team feared losing their jobs based on their interactions and conversations with McKay–Loescher. Although McKay–Loescher likely made the statement to Wagner after she knew that Perry would be taking FMLA leave, she made the statement before Perry's June 18, 2010 call to Wagner about the Monster.com posting. Thus, the "potential turn" comment could not have been made in retaliation for calling Wagner about the Monster.com posting.

Next, Perry asserts that she is relying on the second category of circumstantial evidence, namely "evidence that similarly situated employees were treated differently." (Pl. Br. 16, 19). However, she does not identify any such individuals. In fact, BBW terminated the employment of three other members of Perry's Sales Leadership Team the same day that Perry's employment was terminated for the same policy violations. There is no evidence that any of the three took FMLA leave or complained about interference with rights under the FMLA. *See Cracco,* 559 F.3d at 635 ("Although [Cracco] states that '[n]o

other employee at Vitran was ever terminated for the reasons that the Plaintiff was allegedly terminated for,' … *he is not relieved of the responsibility to point to a similarly situated individual.*" (emphasis added)); *Bilal v. Dietz,* 03 C 9253, 2006 WL 83445, at *6 (N.D.Ill. Jan. 10, 2006) (finding that the plaintiff could not establish a prima facie case of race discrimination under the indirect method because the plaintiff, who was black, had not identified any similarly situated employee who was treated more favorably and, in fact, two white employees were terminated by the same decision maker as part of the same decision-making process), *aff'd sub nom. Bilal v. BP Am., Inc.,* 215 Fed.Appx. 504 (7th Cir.2007).[11]

As to the third category of circumstantial evidence, Perry argues that the reason given for her termination was a pretext.[12] To show pretext, a plaintiff must demonstrate that the decision maker's reason for the termination was dishonest and that the true reason was motivated by discriminatory animus. *See Benuzzi v. Bd. of Educ.,* 647 F.3d 652, 663 (7th Cir. 2011); *Brown v. Ill. Dep't of Nat. Res.,* 499 F.3d 675, 683 (7th Cir.2007); *Perez v. Illinois,* 488 F.3d 773, 777 (7th Cir.2007). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation

---

**10.** Perry goes too far when she characterizes this email statement by Wagner as meaning that "Loescher gave BBW's recruiter a 'head's up' after Perry requested FMLA leave that Perry's store manager position would soon be open and available." (Pl. Br. 24).

**11.** Perry herself argues that the other members of her management team were not similarly situated employees because they did not take leave and, thus, she should not be compared to them. But the fact that they did not take leave and they were treated the *same*

tends to show that Perry was *not* treated differently from others who did not take leave. Regardless, it is not BBW's burden to show that Perry was not treated differently; it is *Perry's* burden to show that a similarly situated employee who did not engage in the protected activity was treated more favorably.

**12.** Perry's brief contains a "pretext" section that applies to both her FMLA and ADEA claims. (Pl. Br. 23).

is unworthy of credence.'" *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir.2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir.2000).

■ Perry cites her positive performance reviews with BBW, that she was a store manager for eight years, and that she had earned bonuses every quarter, including a bonus less than one month prior to her FMLA leave request. Like in *Cracco*, Perry's prior positive performance history does not support causality because the concerns that McKay–Loescher expressed prior to Perry's FMLA leave were confirmed by additional discoveries by Vanessa Lea during Perry's FMLA leave. In *Cracco*, the court held that "the existence of positive performance reviews do not prohibit [the employer] from relying on newly uncovered evidence in its decision to terminate [a plaintiff's] employment." 559 F.3d at 634. Moreover, Perry's employment was terminated for policy and procedure reasons—not for poor sales numbers.

■ Perry also contends that the fact that she was not made aware of these problems, disciplined, or placed on an improvement plan under BBW's progressive discipline policy prior to her FMLA leave is evidence that the reasons for her termination were a pretext for retaliation. (Pl. Br. 19 (citing *Salas v. 3M Co.*, No. 08 C 1614, 2009 WL 2704580, at *19 (N.D.Ill. Aug. 25, 2009) (finding that the employer's failure to abide by its own policy is evidence of discrimination))). Although BBW has a progressive discipline policy that was not used with Perry, there is no evidence that the policy was mandatory for policy and procedure violations. In contrast, McKay–Loescher testified (in the portion of her deposition that Perry cites in support of this argument) that progressive discipline steps can be skipped for certain policy violations.[13] Also, Perry asserts in her brief that she was not made aware of violations by McKay–Loescher, yet Perry detailed in her notes, which were verified at her deposition, her meeting with McKay–Loescher the day she returned to work (July 11, 2010), listing the policy and procedure problems that McKay–Loescher identified for her. *See* (Def. Mot., Exh. B, pp. 41–42 (Perry dep. Exh. 12)). Moreover, although the specific policy and procedure violations may not have been communicated to Perry prior to her FMLA leave, McKay–Loescher communicated them to Wagner on May 27, 2010, before Perry informed McKay–Loescher of her need for FMLA leave.

Perry contends that the reasons given for her discharge are not based in fact because she denies that she committed

---

13. McKay–Loescher testified:

Q: .... did you intend to recommend that Julie be fired?

A: I don't recommend for anybody to be fired, so no.

Q: When you—they don't ask you even whether or not that you think this team member can be coached?

A: I give my coaching through weekly conversations that I have on a touch base. And that's it. Like at that point, they decide, okay, Nikki, you have addressed this

enough, you need to go this route or, okay, Nikki, you can address that. You need to go straight to a second or straight to a final. I just tell day to day, that's what I do in a touch base, when I talk about talent.

Q: A second, what is a second?

A: Again, depending on certain policy violations, you can skip the whole first written, second written, final, and then HR. So I don't know the method to how they come up with which route you take.

(Pl. Br., Exh. 2, p. 84).

most of the policy violations for which she was terminated. However, she has not offered any evidence to dispute the honest belief of Vanessa Lea, McKay–Loescher, or BBW in those violations. Notably, Perry does not address the fact that the three other members of her Sales Leadership Team, who did not take FMLA leave at or around that time, were terminated the same day as Perry for the same policy and procedure violations. *See Bilal,* 2006 WL 83445.

Perry next notes that one form of circumstantial evidence of pretext indicative of retaliation is "inconsistent reasons for her termination," (Pl. Br. 16), and that when an employer gives one reason at the time of an employee's termination and another reason during the course of the federal action, the changed story is evidence of pretext, *id.* 23 (citing *Zaccagnini v. Charles Levy Circulating Co.,* 338 F.3d 672, 676–78 (7th Cir.2003) (holding that the defendant's new explanation for not rehiring plaintiff, given for the first time in its summary judgment *reply* brief, was "fishy" and that a reasonable jury could find that the failure to come forward with this explanation earlier makes it not credible)).

To raise this inference, Perry must point to evidence that places BBW's explanation for her termination in question. *Id.* The fact that the specific policy violations that led to her termination were not included on the formal Termination Notice does not preclude summary judgment because the specific policy and procedure violations are consistent with the general reasons given on the form. *See Jones v. A.W. Holdings LLC,* 484 Fed.Appx. 44, 48–49 (7th Cir. 2012). In *Jones,* the court found that "the inference drawn in *Zaccagnini* is not as strong where, as here, the defendant does not give 'shifting' justifications but instead offers an initially sparse explanation that

later is more fully substantiated." *Id.* at 48–49. The facts of this case are like those in *Jones* rather than *Zaccagnini* because the brief explanation initially provided on Perry's termination form—that Perry had committed policy and procedure violations—is substantiated by BBW's position in this litigation and the contemporaneous evidence of record. BBW cites to Wagner's May 27, 2010 notes that identify many of the policy and procedure concerns, Vanessa Lea's notes taken while she managed the store during Perry's FMLA leave, as well as the fact that, on July 11, 2010, the first day Perry returned from work, McKay–Loescher met with Perry and went over most, if not all, of the same issues.

To show pretext, Perry must demonstrate that BBW, and more specifically McKay–Loescher, did not honestly believe that Perry had committed the policy violations listed in its brief. *See Cracco,* 559 F.3d at 634 n. 4 (citing *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 829 (7th Cir. 2007) (noting that an employee proceeding under the direct method must show the employee's decision was based on a prohibited animus)). Perry again relies on her unsupported assertion that McKay–Loescher exaggerated problems with Perry's store during her leave because Perry contacted Wagner about the Monster.com posting and Wagner then told McKay–Loescher that Perry had called with some concerns. In *Cracco* it was undisputed that the employer discovered problems with Cracco's performance after he began his FMLA leave. *Id.* at 634. Similarly, it is undisputed that McKay–Loescher informed Wagner of concerns she had, not with Perry's store's sales performance, but rather with Perry's policy and procedure violations before Perry requested FMLA leave and that Lea discovered, documented, and reported additional and consistent violations during the leave. Perry offers

no evidence that BBW did not believe that these violations had occurred.

Perry suggests that, when McKay–Loescher was forming her opinions about Perry that were passed on to corporate BBW, McKay–Loescher "made inferences from passing comments by Perry's subordinate employees while Perry was on FMLA leave and made notes; [McKay–Loescher] provided no documented evidence to support her assumptions." (Pl. Br. 24). This statement is not supported by the evidence. Vanessa Lea made the notes and passed them on to McKay–Loescher. As for the propriety of McKay–Loescher's reliance on comments by Perry's subordinate employees in making an employment decision, the question is not whether McKay–Loescher's decision was wise but rather whether she honestly believed it. Perry has not explained how McKay–Loescher's reliance on statements from Perry's subordinates is evidence of discriminatory animus.

■■■ Based on the foregoing, Perry cannot survive summary judgment on her FMLA retaliation claim under the direct method. To the extent Perry is attempting to proceed under the indirect method, she fails as well.[14] Under the indirect method, Perry must first establish a prima facie case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she was meeting BBW's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Simpson, 559 F.3d at 718; Cracco, 559 F.3d at 634–35. Summary judgment in favor of BBW is appropriate if Perry fails to establish any of the elements of the prima facie case. Atanus v. Perry, 520 F.3d 662, 673 (7th Cir.2008). If Perry establishes a prima facie case, then BBW must provide a legitimate, non-retaliatory reason for the adverse action under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Cracco, 559 F.3d at 635. If BBW meets its burden, Perry must show that the reason is pretextual. See Atanus, 520 F.3d at 673.

■■■ Perry cannot make out a prima facie case of FMLA retaliation because she has not identified a similarly situated employee who exercised FMLA rights or who complained about retaliation for opposing prohibited conduct under the FMLA and who was not fired. Moreover, BBW terminated the employment of three other members of Perry's Sales Leadership Team the same day that it terminated Perry's employment for the same policy and procedure violations. There is no evidence that any of the three took FMLA leave or complained about retaliation under the FMLA. Even if Perry could establish a prima facie case, BBW has offered a legitimate non-discriminatory reason for

14. Although Perry mentions the indirect method and in footnote 6 of her response brief states that "[b]oth direct and indirect methods are implicated," (Pl. Br. 14 n. 6), she does so in reference to the Seventh Circuit Court of Appeals' suggestion that the indirect and direct methods may overlap since the analyses of "pretext" and of "similarly situated employees" are common to both methods. See Coleman v. Donahoe, 667 F.3d 835, 860, 860 n. 8 (7th Cir.2012) (commenting in the footnote that the convincing mosaic "provides parties and courts with a little more flexibility and room for common sense than the indirect method sometimes allows" (citing Egonmwan v. Cook Cnty. Sheriff's Dep't, 602 F.3d 845, 851 (7th Cir.2010); Hasan v. Foley & Lardner LLP, 552 F.3d 520, 529 (7th Cir.2008))). Perry does not set out the full test for the indirect method, nor does she conduct an analysis under the indirect method.

her termination, namely the policy and procedure violations McKay–Loescher began to identify before Perry's FMLA leave and the violations discovered by Vanessa Lea during the FMLA leave. As set forth in the previous section, Perry has not demonstrated pretext in relation to her claim for FMLA retaliation.

Stepping back and looking at all the evidence Perry has designated, Perry has not met her burden, under either the direct or indirect methods, of demonstrating that taking FMLA leave or contacting Wagner about the Monster.com posting was a substantial or motivating factor in BBW's decision to terminate her employment. McKay–Loescher verbally made Perry and her Sales Leadership Team aware of issues in April and May 2010 before Perry requested FMLA leave in June 2010; in May 2010, McKay–Loescher contacted the HR department regarding policy and procedure violations at Perry's store; Vanessa Lea detailed in writing policy violations and management issues that she discovered while she was the temporary store manager during Perry's FMLA leave and gave her notes to McKay–Loescher who in turn gave them to the HR department; and the employment not only of Perry but also of three other members of her Sales Leadership Team who had not taken FMLA leave were terminated the same day for policy and procedure violations. Accordingly, summary judgment is granted to BBW and McKay–Loescher in her official capacity on Perry's FMLA retaliation claim.

### 2. Interference

■ Although Perry's wrongful termination claim sounds in retaliation under both § 2615(a)(1) and (a)(2), Perry also alleges interference under § 2615(a)(1), and BBW moves for summary judgment on the interference claim.[15] It is "unlawful

---

**15.** Although it appears to the Court that Perry's claim is one for retaliation under § 2615(a)(1) based on her allegation that she was fired because she took FMLA leave and under § 2615(a)(2) because she opposed protected conduct, Perry also alleges an interference claim in her Amended Complaint and defends her interference claim in her response brief. Many Seventh Circuit cases address similar wrongful termination claims that are based solely on the taking of FMLA leave (when there is no § 2615(a)(2) retaliation claim for "opposing" conduct) under both a retaliation theory as well as an interference theory, even when the plaintiff appears only to make an intent-based argument for the termination. *See Nicholson v. Pulte Homes Corp.,* 690 F.3d 819, 827 (7th Cir. 2012) ("Under the FMLA, termination can constitute a denial of benefits, and a claim based on wrongful termination can be brought either as a retaliation or an interference claim." (citing *Kauffman v. Fed. Exp. Corp.,* 426 F.3d 880, 884 (7th Cir.2005) ("A claim under the FMLA for wrongful termination can be brought under either a discrimination/retaliation or interference/entitlement theory....."))); *Goelzer,* 604 F.3d at 993 (con-

sidering the plaintiff's termination as the basis for an FMLA interference claim as well as a retaliation claim in a case in which the plaintiff was discharged two weeks before the commencement of FMLA leave with an effective discharge date of ten days after the FMLA leave period (citing *Simpson v. Office of the Chief Judge of the Circuit Court of Will Cnty.,* 559 F.3d 706, 712 (7th Cir.2009) ("Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights."))); *see also Pagel,* 695 F.3d at 629–631 (considering the plaintiff's claim that the "employer interfered with his employment by failing to make a reasonable adjustment to its employment expectations to account for his FMLA leave and then terminating him when he failed to meet those unadjusted expectations" as well as the plaintiff's retaliation claim based on the same facts).

Recently, a district court judge in this district found that a plaintiff's interference claim based on his termination for taking FMLA leave was really a retaliation claim. *See Shreeve v. D.O. McComb & Sons, Inc.,* No. 1:12–CV–154, 2013 WL 5707196, at *4 (N.D.Ind. Oct. 21, 2013) (Simon, C.J.) ("Un-

for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, an employee must demonstrate that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her benefits to which she was entitled. *Brown v. Auto. Components Holdings, LLC,* 622 F.3d 685, 689 (7th Cir.2010). It is undisputed that Perry satisfies the first four prongs. However, the parties disagree as to whether Perry can show that BBW denied her a benefit to which she was entitled when BBW terminated her employment. Unlike the retaliation claim, an interference claim does not require a showing of intent.

▆ To succeed on such a claim, the employee must establish, by a preponderance of the evidence, that she was entitled

to the benefits she claims. *Pagel,* 695 F.3d at 629 (citing *Kohls,* 259 F.3d at 804). An employee has a right to reinstatement after taking FMLA leave. 29 U.S.C. § 2614(a); *Goelzer,* 604 F.3d at 993. However, the right to reinstatement is not absolute or unlimited. 29 U.S.C. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); *Goelzer,* 604 F.3d at 993; *Cracco,* 559 F.3d at 636; *Kohls,* 259 F.3d at 805. The FMLA allows an employer to terminate an employee on FMLA leave, if the leave leads to the discovery of performance issues. *Pagel,* 695 F.3d at 629 (citing *Cracco,* 559 F.3d at 636; *Kohls,* 259 F.3d at 804). To survive summary judgment, Perry must overcome any such evidence by BBW that it would have fired her regardless of her having taken leave. *Id.* (citing *Cracco,* 559 F.3d at 636).[16]

der these circumstances, I agree with other courts that Shreeve's claim is really 'only a retaliation claim masquerading' as an interference claim." (citing *Dressler v. Cmty. Serv. Commc'ns, Inc.,* 275 F.Supp.2d 17, 24 (D.Me. 2003); *Mascioli v. Arby's Rest. Grp., Inc.,* 610 F.Supp.2d 419, 432–33 (W.D.Pa.2009))). In contrast, in *Arrigo v. Link Stop, Inc.,* the court noted that retaliation under § 2615(a)(2) was not implicated because the plaintiff had not "opposed" protected activity, but then went on to consider the claim that the plaintiff had been terminated for taking FMLA leave as an interference claim under § 2615(a)(1) rather than as a retaliation claim under § 2615(a)(1) and 29 C.F.R. § 825.220. *See Arrigo v. Link Stop, Inc.,* No. 12–cv–700, 2013 WL 5498139, at *8, 975 F.Supp.2d 976, 985 (W.D.Wis. Oct. 4, 2013).

Notably, in her argument in support of her interference claim, Perry's brief contends that "BBW had no intention of continuing Perry's employment after she requested FMLA leave. These acts are substantiated with written documentation created at the time, and support

an inference of BBW's *bad intent.*" (Pl. Br. 12) (emphasis added).

16. Perry cites *Rice v. Sunrise Express, Inc.* for her statement that the "Seventh Circuit interprets the FMLA to place the burden of proof on the employer to come forward with evidence that Perry's termination would have occurred without FMLA leave," *see* (Pl. Br. 11). However, the court in *Rice* held: "The district court instructed the jury that the defendants had the burden to establish that Ms. Rice *would not have been retained even if she* had not been on FMLA leave.... [W]e have concluded that *this instruction is not an accurate reflection of the statutory mandate." Rice v. Sunrise Express, Inc.,* 209 F.3d 1008, 1016–17 (7th Cir.2000) (emphasis added). Relying on *King,* the court explained that the burden is always on the plaintiff asserting a right to reinstatement under § 2614 to establish the right to the benefit.

If the employer wishes to claim that the benefit would not have been available even if the employee had not taken leave, the

█ BBW argues that Perry cannot satisfy the fifth prong because she was granted all of the FMLA leave time she requested and was then returned to her position as a store manager at the conclusion of her FMLA leave. Perry essentially responds that her employment was terminated because she took FMLA leave and that a reasonable factfinder could conclude that had Perry not taken leave, she would not have been terminated. She then suggests that BBW's new practice was to have stores managed by younger employees by posting store manager positions during FMLA leave and looking for ways to exaggerate shortcomings to create a seemingly legitimate reason for the employee's termination.

In support, Perry makes similar arguments to those offered in support of her retaliation claim. As discussed at length above in the previous section, BBW has provided evidence that Perry committed policy and procedure violations that led to her termination. The possibility that not all of those violations or their extent might have been discovered if Perry had not taken leave does not mean that BBW interfered with her FMLA rights. *See Pagel*, 695 F.3d at 629; *Cracco*, 559 F.3d at 636. In *Cracco*, the Court held that an employer could terminate an employee who takes FMLA leave if policy violations are discovered as a result of that leave. *Cracco*, 559 F.3d at 636. As recognized above, Perry contests whether she violated policies and procedures, but Perry does not contest Vanessa Lea's reports or that BBW honestly believed that these viola-

tions occurred. Even construing the facts in the light most favorable to Perry, Perry has not created a genuine issue of material fact that she was denied benefits to which she was entitled. Summary judgment is granted to BBW and McKay–Loescher in her official capacity on Perry's FMLA interference claim.

### 3. Liquidated Damages

In her response brief, Perry cites 29 U.S.C. § 2617 to claim that BBW has the burden of proving it acted in good faith to avoid paying liquidated damages, and Perry requests that the Court enter summary judgment in her favor on her claim for liquidated damages.[17] First, the Court's grant of summary judgment in favor of BBW on Perry's FMLA interference and retaliation claims moots Perry's request. Moreover, Perry has not filed a motion for summary judgment; thus, the legal issue of liquidated damages is not before the Court.

### B. Age Discrimination in Employment Act

█ The Age Discrimination in Employment Act ("ADEA") provides, in part, that "[i]t shall be unlawful for an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The protections for individuals under the ADEA are limited to individuals over 40 years of age. 29 U.S.C. § 631(a). A plaintiff faced with a motion for summary judgment in an ADEA case is required "to show evidence that could support a jury verdict that age

employer must submit evidence to support that assertion. When that burden of going forward has been met, however, the employee must ultimately convince the trier of fact, by a preponderance of the evidence, that, despite the alternate characterization offered by the employer, the benefit is one that falls within the ambit of § 2614(a)(1);

the benefit is one that the employee would have received if leave had not been taken. *Rice*, 209 F.3d at 1018.

**17.** In her response brief, Perry cites "29 U.S.C. § 2817," which does not exist. The correct code section is 29 U.S.C. § 2617(a)(1)(A)(iii) (2012).

was a but-for cause of the employment action at the summary judgment stage." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir.2012) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (holding that a plaintiff must show that age was the but-for cause of the adverse employment action, and not simply a motivating factor, to prevail on an age discrimination claim under the ADEA)). A plaintiff may attempt to prove discrimination through either the direct or indirect method. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir.2013) (citing *Fleishman*, 698 F.3d at 603). Perry proceeds under both methods.

Under the direct method, Perry has established that she was 50 years old at the time of her termination. The remaining question is whether Perry's age was the but-for cause for her termination, which Perry can attempt to demonstrate with either direct or circumstantial evidence. *Fleishman*, 698 F.3d at 603. Because she has no direct evidence of age discrimination, Perry must proceed with circumstantial evidence by providing evidence of facts that would permit a jury to find a convincing mosaic of inferences that Perry's age was the but-for cause of her termination. *Fleishman*, 698 F.3d at 604.

▬▬ As an initial matter, Perry asserts that the Court must accept her version of events for the purposes of summary judgment. This assertion misstates the law. In a motion for summary judgment a court will give the non-moving party "the benefit of all facts that a reasonable jury may find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir.2011). The facts must be based on admissible evidence. *Hobgood*, 731 F.3d at 643. When considering whether Perry has created a "convincing mosaic of circumstantial evidence," the Court looks

at all of the admissible evidence together to determine if a reasonable inference of discrimination can be drawn. *Id.* ("[T]he individual 'bits and pieces' presented by the plaintiff must be put into context and considered as a whole."). As with the FMLA claim, circumstantial evidence from which an inference of discriminatory intent can be drawn may include (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which a retaliatory intent might be drawn," (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently," or (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Perez*, 731 F.3d at 711.

▬▬ In the motion for summary judgment, BBW argues that Perry cannot present a convincing mosaic. Perry responds by listing nine factual assertions. Perry offers no citation to the evidence of record for these facts within or after the list in this portion of her brief. She also offers no analysis of the facts and cites only the general law on creating a convincing mosaic of circumstantial evidence. The assertions are: (1) at the Field Leadership Conference in late May 2010, Perry was instructed that BBW was going to market to a younger customer; (2) while Perry was on FMLA leave, Defendants looked for shortcomings pre-dating her leave to cause Perry's termination; (3) during Perry's FMLA leave, McKay–Loescher asked another store manager about Perry's age; (4) Perry was replaced by Sondra Sikanovski, who is substantially younger and had no prior job experience at BBW; (5) BBW failed to provide written documents that would justify Perry's alleged shortcomings and performance issues; (6) McKay–Loescher compared another BBW store manager to Perry based on age; (7) other store managers and co-

managers complained of age discrimination by McKay–Loescher; (8) McKay–Loescher informed another store manager that her view on age aligned with BBW's; and (9) Defendants' reasons for terminating Perry are pretextual. (Pl. Br. 21–22). Perry must present evidentiary support for each of her claims. *See* Fed.R.Civ.P. 56(c)(1), (e)(2), (3); *see also Anderson,* 477 U.S. at 248–250, 106 S.Ct. 2505. In the interests of justice, the Court considers the remainder of Perry's brief to the extent she offers citations to evidence of record to support these nine asserted facts.

First, the second and eighth factual statements are unsupported by the evidence of record. The second fact, that "while Perry was on FMLA leave, Defendants looked for shortcomings predating her leave to cause Perry's termination," is unsupported by any citation to evidence in Perry's brief. Notably, on page 19 of her brief, Perry makes a similar assertion, also with no citation to evidence: "Loescher supplied HR with these perceived shortcomings so that Perry could be terminated for alleged poor performance." (Pl. Resp. 19). Moreover, Perry does not explain how this allegation regarding her FMLA leave relates to her claim of age discrimination.

As to the eighth fact, that "Loescher informed another store manager that her view on *age* aligned with BBW's," (Pl. Br. 22) (emphasis added), there is no such evidence of record. Perry incorrectly cites Exhibit 3t, which is a document informing Mary Ellen S. that her FMLA leave was approved. Perry may have intended to cite Exhibit 3u, which was Mary Ellen S.'s resignation letter. However, Mary Ellen S.'s letter makes no reference to age. More specifically, the comment in that letter regarding McKay–Loescher being "aligned" with BBW does not reference

age: "It is sad to leave a job I loved and the customers I loved. My fellow SLT team is also leaving because we feel [McKay–Loescher] has told us she's 'partnered and aligned' with H.R., and this is BBW's new style of 'coaching.'" (Pl. Br., Exh. 3u). The second and eighth assertions lack evidentiary support and will not be considered.

■ The Court turns to Perry's remaining assertions. The fourth factual assertion, that Perry was replaced by a substantially younger individual, is a necessary element of the prima facie case under the indirect method, but under the direct method it is just another piece of circumstantial evidence. Standing alone, this allegation would not be enough to support Perry's claim, but "'together with other facts,' [it] could be sufficient to defeat summary judgment.... That's why it's critical to consider the plaintiff's evidence as a whole." *Hobgood,* 731 F.3d at 644 (citations omitted); *Fleishman,* 698 F.3d at 603. Perry also adds the comment that Sikanovski "had no prior job experience at BBW" (Pl. Br. 22); however, Perry fails to mention that Sikanovski was a store manager at another store in the same mall.

■ The first assertion, that "Perry was instructed that BBW was going to market to a younger customer," (Pl. Br. 21), is supported by Perry's testimony that BBW representatives Diane Neal and Ken Montera told everyone at the BBW Field Leadership Conference in May 2010 that "the Company is going in a different direction we are trying to hit the younger people." (Def. Br., Exh. 3, p. 38; Pl. Br., Exh. 1, 137–41). "[A] particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v.*

*Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir.2007) (citing *Hunt v. City of Markham, Illinois,* 219 F.3d 649, 652–53 (7th Cir.2000)). First, Perry has not alleged that Neal or Montera were involved with the decision to terminate her employment. Second, the statement was made approximately two months prior to her termination, which was not contemporaneous with Perry's termination. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 910–11 (7th Cir.2002) (holding that statements were not made contemporaneously when they were made almost two months prior to the adverse employment action). Finally, the comment did not refer to Perry's individual termination, nor did the comment refer to employment decisions. In fact Perry characterizes the statement in her response brief as marketing to a "younger customer." (Pl. Br. 21). Even if the statement were susceptible to the interpretation that BBW management was announcing that it was going to make employment decisions based on age, the statement, unconnected to Perry's termination, is insufficient to establish a discriminatory animus. *See Fleishman,* 698 F.3d at 604–05 (finding that the statement "hey, she's out to get me too" fell short of evidencing discrimination in part because it was ambiguous and devoid of any indication that the speaker's alleged motivations were age related); *Lackey v. Biomet Inc.,* No. 1:09–cv–363, 2011 WL 3101575, at *9–10 (N.D.Ind. July 25, 2011) (finding no evidence that the statement "out with the old, in with the new" was intended to insinuate age discrimination by the speaker or the company).

Although Perry does not identify the other BBW store managers referenced in the third, sixth, and seventh assertions, it appears that she is referring to store manager Candace K. based on Candace K.'s July 29, 2010 report to the HR department ethics and compliance hotline and to an anonymous call to the hotline sometime between June 4, 2010 and July 2, 2010.[18] The third and sixth assertions, that "Loescher asked another store manager what is Perry's age" and "Loescher compared another BBW store manager to Perry based on age," are based on Candace K.'s report during the call to the HR department on July 29, 2010, of a conversation during the week of July 13, 2010, when McKay–Loescher spoke to Candace K. about her work style and how the store should be run differently. Candace K. reported that McKay–Loescher said that she did not think that Candace K. was as old as "Sales Associate, Julie UNKNOWN, who is around 47 or [Krissy B.] who is around 42," and that Candace K. responded that she was fifty years old. (Pl. Br., Exh. 3v, p. 1). Candace K. also stated in the phone call that Julie was "terminated." *Id.* In her Declaration, McKay–Loescher denies making any comments about Perry's age to Candace K. or any other employee. Although the age-related question and comments were made by McKay–Loescher during the week that Perry's employment was terminated, the comments were not made in reference to Perry's termination or any other potential adverse employment action against Perry.

The seventh assertion is that "other store managers and co-managers com-

---

**18.** Although any statement on this issue by McKay–Loescher is not hearsay because it is a statement of a party opponent, *see* Fed. R.Evid. 801(d), it is not clear that the out-of-court statements of Candace K. reporting McKay–Loescher's statements are subject to a hearsay exception. Candace K.'s statements are reported by Perry in her deposition testimony and on an unauthenticated Ethics and Compliance Hotline form dated July 29, 2010. Similarly, the support for the anonymous call is an unauthenticated and untitled informal report not typed on the Ethics and Compliance Hotline form.

plained of age discrimination by Loescher." (Pl. Br. 22). It appears that Perry is relying on two documents. First, Candace K. stated in her July 29, 2010 report to the HR department that *she* felt that McKay–Loescher may not have wanted her working at the store any longer because of the age-related question and comment the week of July 13, 2010. Candace K. reports that on July 25, 2010, Candace K. commented that she thought she was going to be fired, and on July 27, 2010, McKay–Loescher told Candace K. that it was against company policy to say that she thought she would be fired. Candace K. reported that on July 28, 2010, a sales associate, who is "older," was written up for being one minute late. Candace K. reported that at one point, McKay–Loescher told Candace K. that she was going to check the company policy regarding whether Candace K. was going to be terminated for saying that she thought she was going to be fired. Candace K. resigned from BBW on July 29, 2010. Candace K. also felt that her age was a factor because McKay–Loescher "told [Candace K.] that the store was going in another direction and [Candace K.'s] working style was not the way the store needed to be run now." (Pl. Br., Exh. 3v, 1). McKay–Loescher also told Candace K. that she had a problem with prioritizing. None of these statements by McKay–Loescher are age-based, and they do no more than show that Candace K. herself felt that she was being discriminated against based on age; they do not offer insight into McKay–Loescher's intentions. *See, e.g., Gibbs v. G.D. Searle Co.*, No. 98 C 2538, 2000 WL 960744, at *28 (N.D.Ill. July 10, 2000) (finding that survey responses of anonymous employees who reported that they feared they would be retaliated against if they complained about the race relation problems they perceived provided no in-

sight into the intentions of the decision makers).

In the July 29, 2010 call to the HR department hotline, Candace K. also reported that Krissy B. resigned because she was harassed by McKay–Loescher and Vanessa Lea (the store manager where Candace K. worked). Notably, Candace K. does not report that Krissy B. resigned because she was being harassed based on *age*. To the extent that Candace K.'s report is probative, it shows a jury that McKay–Loescher asked about the ages of two employees and stated that Candace K. appeared younger than a sales associate named Julie.

Perry also cites what appears to be a report of an anonymous call to the HR department hotline (although it is not reported on the same form as Candace K.'s call and contains no indicators of its origin, or even its date) in which the caller complained of mistreatment based on age by Vanessa Lea, possibly at McKay–Loescher's request. However, the caller offers no facts to support the allegation other than that she was the oldest person in her store holding a management position. *See* (Pl. Br., Exh. 3w). This anonymous report does not demonstrate discrimination and offers no probative facts for the jury. *See Maclin v. N. Telecom, Inc.*, No. 95 C 7485, 1998 WL 386360, at *10 (N.D.Ill. July 6, 1998) ("A showing of other instances of discrimination in the company may have evidentiary value, but it is not a substitute for a showing of injury to the plaintiff." (quoting *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1004 (7th Cir.1994))).

Finally, the statements numbered five and nine both go to pretext. In statement five, Perry asserts that BBW "failed to provide written documents that would justify Perry's alleged shortcoming and performance issues." (Pl. Br. 22). This is incorrect. As discussed in the context of

Perry's FMLA claim, BBW has offered several facially nondiscriminatory reasons for Perry's termination and offered contemporaneously documented evidence in support, beginning with McKay–Loescher's comments to Perry in April 2010, McKay–Loescher's report to Wagner in May 2010, and Vanessa Lea's notes taken while serving as Perry's temporary replacement store manager in June 2010.

▉▉▉ The ninth factual assertion is the general statement that "Defendants' reasons for terminating Perry are pretextual." (Pl. Br. 22). In order to show pretext for an ADEA claim, Perry must show that BBW's stated reasons for terminating her were "made up to cover up their discriminatory reasons." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 646 (7th Cir.2006). Under the ADEA, "[p]retext will not be found where an employer holds an honest belief for the reason it offers." *Benuzzi*, 647 F.3d at 663. Perry has not presented any evidence that Vanessa Lea, McKay–Loescher, or BBW did not honestly believe the alleged policy and procedure violations had occurred that led to the decision to terminate her. Although Perry addresses pretext in a separate section of her brief (part D) as opposed to within the analysis of either her FMLA or ADEA claims, her entire pretext analysis is based on her FMLA claims. As set forth in the previous section on Perry's FMLA claims, Perry has failed to show that the reasons given for her termination were not honestly believed or were a pretext for discrimination. Thus, there is no evidence presented by Perry that could lead a reasonable jury to find that BBW's stated reasons for terminating Perry were a pretext for age discrimination.

When these factual assertions, construed in Perry's favor, are considered together, there is not enough evidence to create a convincing mosaic under the direct method from which a reasonable jury could infer age discrimination because the evidence does not lead to an inference that Perry's age was the but-for cause for her dismissal.

▉▉▉ To survive summary judgment under the indirect method, Perry must demonstrate the following elements of a *prima facie* case of age discrimination: (1) she was in the age group protected by the ADEA; (2) she was discharged or demoted; (3) at the time of her discharge or demotion, she was performing her job at a level that met her employer's legitimate expectations; and (4) following her discharge or demotion, she was replaced by someone substantially younger. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Fleishman*, 698 F.3d at 609 (citing *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir.2002)); *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir.1997) ("[W]e consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively 'substantial' under *O'Connor*.").[19] For conciseness, a court "may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Benuzzi*, 647 F.3d at 663 (citing *Adelman–Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir.2007); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir.2010)). As set forth above, BBW has offered evidence that it terminated Perry's employment for policy and procedure violations,

**19.** In her brief, Perry cites the elements for a prima facie case of age discrimination *in hir-* *ing,* which is not at issue in this case.

and Perry has failed to meet her burden of demonstrating that BBW's reason for her termination was a pretext for age discrimination.

Thus, the Court grants summary judgment in favor of BBW and McKay–Loescher in her official capacity on the ADEA claim.

### C. Americans with Disabilities Act

■■■ The Americans with Disabilities Act ("ADA") prohibits employers from discriminating against a qualified individual on the basis of disability, whether in hiring, promotion, firing, or other employment actions. 42 U.S.C. § 12112(a). In her Amended Complaint, Perry alleges that she was discriminated and retaliated against because of her skin cancer. In the instant motion, BBW identifies evidence that Perry was terminated for violations discovered while on FMLA leave, that McKay–Loescher was not aware that Perry had cancer, and that none of the other members of Perry's team who were terminated the same day as Perry for the same policy violations had skin cancer or were disabled. Perry has not offered any response in support of her ADA claim. When a party fails to respond to an issue raised in a summary judgment motion, the issue is deemed abandoned and waived. *See, e.g., Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir.2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (stating arguments not presented to the court in response to a summary judgment motion are waived). Accordingly, summary judgment in favor of BBW on Perry's ADA claims is proper. *See Swan-*

*er v. Barbieri*, No. 1:10–CV–928, 2013 WL 1294485, at *4 (S.D.Ind. Mar. 28, 2013).

### D. ERISA

■■■ Perry alleges in the Amended Complaint that her employment was terminated because she was using ERISA benefits during her skin cancer treatment and that BBW believed she would continue to use those benefits. To prove a violation of ERISA § 510, a plaintiff must establish more than a loss of benefits; she must demonstrate that her employer terminated her with the specific intent of preventing or retaliating for the use of benefits. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir.2005) (citing *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998)). Perry did not respond to the instant Motion for Summary Judgment on her ERISA claim, waiving her right to do so. *See Palmer*, 327 F.3d at 597–98; *Caruso*, 197 F.3d at 1197. Accordingly, summary judgment in favor of BBW on Perry's ERISA claim is proper. *See Swaner*, 2013 WL 1294485, at *4.

### E. Wage Claims/Wage Payment Statutes

In her Amended Complaint, Perry brings claims under both Indiana Code §§ 22–2–5–1 and 22–2–9–1 *et seq.*, the Indiana Wage Payment Statute and Indiana Wage Claims Statute, respectively.[20] BBW moves for summary judgment on both claims.

■■■ The Indiana Wage Payment Statute applies to current employees and employees who voluntarily left their jobs. *See* Ind.Code Ann. § 22–2–5–1; *St. Vincent Hosp. and Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind.2002);

---

**20.** The Court has supplemental jurisdiction over these Indiana state law claims pursuant to 28 U.S.C. § 1367(a).

*Quimby v. Becovic Mgmt. Group, Inc.*, 946 N.E.2d 30, 33 (Ind.Ct.App.2011). The Indiana Wage Claims Statute "applies to employees who have been separated from work by their employer and to employees whose work has been suspended as a result of an industrial dispute." *Quimby*, 946 N.E.2d at 33 (citing *E & L Rental Equip., Inc. v. Bresland*, 782 N.E.2d 1068, 1070 (Ind.Ct.App.2003)). Because Perry was involuntarily separated from her employment at the time she filed her claim, she may only seek relief under the Indiana Wage Claims Statute.[21]

■■■ The Indiana Wage Claims Statute does not permit a claimant to file her claim directly with the court. *Hollis*, 941 N.E.2d at 538. Rather, the claim must first be submitted to the Indiana Department of Labor ("IDOL"). *Id.* BBW asserts that Perry has not filed her claim with the IDOL, and Perry offers no evidence to the contrary. Thus, this claim is not properly before the Court. *See Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 710 F.Supp.2d 777, 809 (N.D.Ind.2010) ("As the Wage Claims Statute requires that [plaintiff] file a claim with the IDOL, and she did not do so, the court will grant summary judgment in favor of [defendants] on her wage claims."), *aff'd* 646 F.3d 487, 492 (7th Cir.2011). In addition, Perry has not offered any response in support of either state law claim, waiving her right to do so and abandoning the claims. *See Palmer*, 327 F.3d at 597–98; *Caruso*, 197 F.3d at 1197. Accordingly, summary judgment is granted to BBW on Perry's claims under the Indiana Wage

Claims Statute and the Indiana Wage Payment Statute.

## CONCLUSION

The Court **GRANTS in part** and **DENIES in part** the Motion for Leave to File Under Seal Certain Documents Filed in Support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [DE 54]. The Court **ORDERS** that Plaintiff Julie Perry file redacted versions of Exhibits 3a (page one only), 3c, 3u, and 3v with the redactions set forth in this Opinion and Order. The Court **ORDERS** that Exhibits 3p, 3r, 3t, and 3s remain under seal. The Court **DIRECTS** the Clerk of Court to **UNSEAL** Exhibits 3q, 3w, and 5 at docket entry 49.

For the foregoing reasons the Court hereby **GRANTS in part** and **DENIES without prejudice in part** Defendants' Motion for Summary Judgment [DE 42].

The Court **GRANTS** summary judgment in favor of Defendant Bath & Body Works, Inc. on all claims brought against it, including the claims brought against Defendant McKay–Loescher in her official capacity. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Bath & Body Works, Inc. and against Plaintiff Julie Perry.

The Court **DENIES without prejudice** the Motion for Summary Judgment brought by Defendant McKay–Loescher in her individual capacity because this matter **REMAINS STAYED** as to Defendant McKay–Loescher in her individual capacity.

---

**21.** The Indiana Court of Appeals determined that an employee's status at the time the wage claim is filed, and not at the time the claim accrues, determines whether the employee proceeds under the Indiana Wage Payment Statute or the Indiana Wage Claim Statute. *See Hollis v. Defender Sec. Co.*, 941 N.E.2d 536, 540 (Ind.Ct.App.2011). Although the

Indiana Supreme Court has not addressed this issue, the Seventh Circuit Court of Appeals followed the reasoning in *Hollis*, predicting that the Indiana Supreme Court would agree. *See Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 646 F.3d 487, 492 (7th Cir.2011).

Because only the claims against Defendant McKay–Loescher in her personal capacity remain, the Clerk of Court is **DIRECTED** to **MARK** this action **CLOSED** for statistical purposes. The Court further **ORDERS** that the Court shall retain jurisdiction and that the case shall be restored to the trial docket upon motion of a party if circumstances change so that it may proceed to final disposition; this order shall not prejudice the rights of the parties to this litigation.